# KANSAS CITY SOUTHERN RAILWAY COMPANY
## v. C. H. ALBERS COMMISSION CO.

ERROR TO THE SUPREME COURT OF THE STATE OF KANSAS.

No. 18.   Argued October 26, 1911.—Decided February 26, 1912.

The insistence in the state court by an interstate carrier that a shipper cannot recover excess collected over a special contract rate because the rate collected conformed to the applicable provisions of the Interstate Commerce Act is an adequate assertion of a right or immunity under that act, and this court can review judgment in favor of the shipper.

On writ of error to the state court this court may examine the entire record, including the evidence, to determine whether what purports to be a finding of fact is not so involved with, and dependent upon, questions of Federal law, as to be really a decision thereof.

In this case the finding of the state court as to a rate charged by an interstate carrier necessarily involved the interpretation and construction of the Interstate Commerce Act, and this court can examine the evidence and ascertain for itself the validity of the rate under the statute.

Posting the schedules of rates of interstate carriers as required by § 6 of the Interstate Commerce Act is a means of affording special facilities to the public for ascertaining the rates actually in force but is not essential to make the rates legally operative.

The sanction by connecting carriers of through rates published by another carrier is only essential as to their application to the haul from common points; rates from other points are individual and not joint.

Where a schedule of joint rates is not restricted to particular lines designated, it will be presumed, where there is testimony to that effect, as applying to shipments received from any connecting line of goods originating at the designated points.

Although the testimony offered may not be the best evidence, it cannot be disregarded if offered and admitted without objection. *Diaz v. United States, ante*, p. 442.

Where there is no applicable through rate established, shipments,

even if moving on through bills of lading, must take the local rates unless displaced by a lawful.special agreement.

A special rate agreement which departs from the established local rate for the benefit of a single shipper, no schedule of which is filed with the Interstate Commerce Commission, violates § 6 of the Interstate Commerce Act.

A carrier is not liable to action to refund the excess over an illegal special rate if the rate actually collected is the applicable legal published rate.

79 Kansas, 59, reversed.

THE facts, which involve the right of recovery from an interstate carrier of difference between contract rates and rates actually charged, and the validity, under the Interstate Commerce Laws, of the rates contracted for and collected, are stated in the opinion.

*Mr. Cyrus Crane,* with whom *Mr. Samuel W. Moore* was on the brief, for plaintiff in error:

The right claimed by the plaintiff in error under the Federal statute is dependent upon the existence and the application of the tariffs filed pursuant to law. This right cannot be defeated by a finding of fact by the state court, either against the existence of the tariff or that it did not apply to the shipments in question. This court has the right to exercise its own judgment, as to whether a tariff was lawfully filed fixing rates controlling all shipments, and whether such rates applied to and controlled the charges upon the particular shipments. *Nor. Pac. Ry. Co. v. Minnesota,* 208 U. S. 583; *Chic., B. & Q. Ry. Co. v. Nebraska,* 170 U. S. 57; *Stearn v. Minnesota,* 179 U. S. 223; *Mobile & Ohio Ry. Co. v. Tennessee,* 153 U. S. 486; *Huntington v. Attrill,* 146 U. S. 657.

Neither the findings nor the rulings of the state court in such matters as these can prevent the determination of the right asserted under the constitution and laws of the United States. *St. Louis Ry. Co. v. Arkansas,* 217 U. S. 136.

The state court was without jurisdiction of this cause.

The lawfully established tariff rates applying on the shipments in question over the line of the garnishee were charged and collected in all cases.

Plaintiff's claim depends upon a departure from the published rates. The inflexibility of published rates must be maintained in every court until the Commission shall, by its order, level the rate for the benefit of every one. *Texas Ry. Co.* v. *Abilene,* 204 U. S. 426; *Mo. Ry. Co.* v. *Milling Co.,* 80 Kansas, 141; *Coal Co.* v. *Lumber Co.,* 159 Fed. Rep. 278; *Van Patten* v. *Railroad,* 81 Fed. Rep. 545; *State* v. *Railway Co.,* 176 Missouri, 687; *Carlisle* v. *Railway Company,* 168 Missouri, 652; *Morrisdale Coal Co.* v. *Pennsylvania R. Co.,* 183 Fed. Rep. 929.

The plaintiff's entire claim is illegal and non-enforceable for the reason that it is based upon an arrangement whereby the carrier was to serve Forrester Brothers for less than the established rate.

As to the meaning of the proportional rate and how the same is applied, see *Bascom Co.* v. *Railway Co.,* 17 I. C. C. Rep. 356.

A clear explanation of proportional rates is given by "The Matter of Form and Contents of Rate Schedules," 4 I. C. C. Rep. 701; Moore on Interstate Commerce, § 48; Barnes on Interstate Transportation, § 80 D.

Proportional rates are recognized as proper. *Serry* v. *Southern Pacific Ry. Co.,* 18 I. C. C. 556; *North Brothers* v. *Railway Company,* 13 I. C. C. 153; *Kansas City Transportation Bureau* v. *Railway Company,* 16 I. C. C. 195; *Lindsay Brothers* v. *R. R. Co.,* 16 I. C. C. 6, and *In re Through Routes and Through Rates,* 12 I. C. C. 164, 172; and see *Armour Packing Company Case,* 153 Fed. Rep. 1; *S. C.,* 209 U. S. 56; *Chicago, B. & Q. Ry. Co.* v. *United States,* 157 Fed. Rep. 830.

The presumption, in the absence of proof, is that rates between these points had been duly and legally established. *Mecker* v. *R. R.,* 162 Fed. Rep. 354; *Texas &*

*Pacific* v. *Abilene Co.*, 204 U. S. 426; *Int. Com. Comm.* v. *Railway Co.*, 209 U. S. 108, 121; *Clement* v. *Railway Co.*, 153 Fed. Rep. 979; *American Union Coal Co.* v. *Railway Co.*, 159 Fed. Rep. 278.

This proportional rate is fixed and inflexible, by reason of its being established in accordance with law, as though it had been fixed by an act of Congress. No contract or other device could vary or depart from it. Any contract undertaking to vary from the published rate would be void. This is conclusively established by the following decisions of this court. *Gulf, Colorado & S. F. Ry. Co.* v. *Hefley*, 158 U. S. 98; *Texas & Pac. R. R. Co.* v. *Mugg*, 202 U. S. 242; *Armour Packing Co.* v. *United States*, 209 U. S. 256.

Other decisions are to the same effect: *Hawley* v. *Coal Company*, 48 Kansas, 593; *Railroad Co.* v. *Hubbell*, 54 Kansas, 232; *Kizer* v. *Railway Co.*, 66 Arkansas, 348; *Armour Packing Co.* v. *United States*, 153 Fed. Rep. 1; *Railway Co.* v. *Standard Lumber Co.*, 174 Fed. Rep. 107; *Railroad Co.* v. *Harrison*, 119 Alabama, 539; *Railroad Co.* v. *Ostrander*, 66 Arkansas, 567; *Bullard* v. *Railroad Co.*, 10 Montana, 168; *Railroad Co.* v. *Swanson*, 102 Georgia, 754; *Southern Wire Co.* v. *Railway Co.*, 38 Mo. App. 191; *Messenger* v. *Railway Co.*, 36 N. J. Law, 407; *Scofield* v. *Railway Co.*, 43 Oh. St. 571; *Fitzgerald* v. *Railway Co.*, 63 Vermont, 169; *Railway Co.* v. *Burdick*, 94 Georgia, 775; *Railroad Co.* v. *Erwin*, 118 Illinois, 250; *Railway Co.* v. *Bowles*, 1 Ind. Terr. 250; *Gerber* v. *Railway Co.*, 63 Mo. App. 145; *Railway Co.* v. *Holmes*, 18 Oklahoma, 92; *Railway Co.* v. *Stoner*, 5 Tex. Civ. App. 50; *Railway Co.* v. *Clements* (Tex. Civ. App.), 49 S. W. Rep. 913; *Railway Co.* v. *Wilcox*, 99 Virginia, 394; *Railway Co.* v. *Creety*, 5 Ga. App. 424; *Chicago, B. & Q. Ry. Co.* v. *United States*, 157 Fed. Rep. 830.

There is no pretense that this joint rate was ever published as required by law.

A shipper is not entitled to avail himself of a division of a through rate.

As to a shipper a joint rate is an indivisible unit. The law does not require divisions of joint rates to be published. They are purely a matter of private contract between the carriers. Such private contracts are not for the benefit of shippers and cannot be availed of by them. *Second Natl. Bank* v. *Grand Lodge*, 98 U. S. 123; *Keller* v. *Ashford*, 136 U. S. 610; *Sayward* v. *Dexter*, 72 Fed. Rep. 758; *American Bank* v. *Railway Co.*, 76 Fed. Rep. 130; *Metropolitan Trust Co.* v. *Topeka Water Co.*, 132 Fed. Rep. 702; *German Insurance Co.* v. *Water Co.*, 174 Fed. Rep. 768.

*Mr. John M. Wayde* and *Mr. Philip Pitt Campbell* for defendant in error:

State courts have jurisdiction at common law.

This is not an action to in any way regulate commerce among the States, but simply an action to recover on a contract. The common-law right of a state court to hear and determine actions of this kind has never been questioned. *Texas & P. R. Co.* v. *Abilene Cotton Oil Co.*, 204 U. S. 426; *West Virginia Transportation Co.* v. *Sweetzer*, 25 W. Va. 434; *Peters* v. *Railroad Co.*, 42 Oh. St. 275; 51 Am. Rep. 814; *Railroad Co.* v. *Lockwood*, 17 Wall. 379; *McGregor* v. *Erie Railway Co.*, 35 N. J. Law, 89, 113.

This jurisdiction of state courts has not been abrogated by Interstate Commerce Act. In fact that act says that its provisions are in addition to the remedies at common law.

This action is independent of the Interstate Commerce Act, and is not an action to recover damages by reason of the violation of any of the provisions of that act. *Ratican* v. *Terminal R. R. Assn.*, 114 Fed. Rep. 671.

That statute is a highly penal one, conferring certain rights upon the party aggrieved, recoverable by him in a civil action, and also subjecting the party offending to its

pains and penalties. *Parsons* v. *Railroad Co.*, 167 U. S. 447.

The statute does not say that the Federal courts shall be the forum when the liability arises independent of the Interstate Commerce Act. Under substantially similar circumstances as the case at bar, the state courts have retained jurisdiction. *Mo. Pac. Ry. Co.* v. *Relf*, 78 Kansas, 463; *Wabash R. R. Co.* v. *Sloop*, 98 S. W. Rep. 607; *Southern Kansas R. Co.* v. *Burgess*, 90 S. W. Rep. 189; *Gulf R. R. Co.* v. *Leatherwood*, 69 S. W. Rep. 119; *Ry. Co.* v. *Horne*, 59 S. W. Rep. 134.

On the facts found by the state court the judgment rendered was not inconsistent with the Interstate Commerce Law.

All that can possibly be claimed on the part of plaintiff in error is that it had a different proportional rate between certain other railroad companies at the time that this grain was shipped to what it had under its joint traffic arrangement with the northern connecting lines, and to its rate specified in its contract with Forrester Brothers.

A railway company can accept a certain rate per hundred pounds as its proportion of a through haul from one railway company and a different rate per hundred pounds as its proportion of a through haul from another railway company.

A railway company cannot relieve itself from the obligations of its contract by failing to comply with the Interstate Commerce Law with reference to filing and publishing its rates, and a contract is not illegal when made with the shipper when it is not shown that the contract rate is in violation of any through rate established by the railroads or is not in conflict with any published rate of the railroads over which the grain is shipped and which is applicable to the shipment. *Little Rock & Memphis Ry. Co.* v. *St. Louis & Southwestern Ry. Co.*, 63 Fed. Rep. 775; *S. C.* 26 L. R. A. 195.

Arrangements or agreements by interstate carriers with each other for the through billing of freight, and for joint through rates depend upon the voluntary action of the parties, and cannot be enforced by judicial proceedings without additional legislation. *Little Rock & M. R. Co.* v. *East Tenn., V. & G. R. Co.,* 4 I. C. C. 261; 47 Fed. Rep. 771; *Little Rock & M. R. Co.* v. *St. Louis, I. M. & S. R. Co.,* 41 Fed. Rep. 559; 2 I. C. C. 763; *Oregon Short Line* v. *Northern Pac. R. Co.,* 51 Fed. Rep. 465, 474; 4 I. C. C. 249.

The Interstate Commerce Act does not make it obligatory upon connecting carriers to enter into traffic arrangements for through billing and rating either as to passenger or freight traffic. *Kentucky & I. Bridge Co.* v. *Louisville & N. R. Co.,* 37 Fed. Rep. 567, 630, 631; 2 I. C. C. 351; 2d Ann. Rep., 2 I. C. C. 510.

If the public interest requires that interstate carriers be compelled to put in force arrangements for through billing and rating, and for the establishment of joint through lines, the statute should be more explicit, and the commission should be empowered to prescribe the terms of such arrangements upon a comprehensive view of the circumstances of each particular case. *Chicago & N. W. Ry. Co.* v. *Osborne,* 52 Fed. Rep. 915; *Express Cases,* 117 U. S. 1; *Tozer* v. *United States,* 52 Fed. Rep. 919.

Through rates are matters of agreement between carriers. *L. R. & M. R. R. Co.* v. *Tenn., Va. & Ga. R. R.,* 3 I. C. C. 1; *Copehart* v. *L. & N. R. R. Co.,* 4 I. C. C. 3 I. C. C. 278; *In re Clark, Agent,* 3 I. C. C. 649.

Through rates are not necessarily illegal, which, when divided between carriers, give them less than their local rates, provided that the through rate itself is not less than some one of the locals, or unjustly discriminating against individuals or localities, or so low as to burden other business with part of the cost of the business upon which it is imposed. *Lippman* v. *Ill. Cent. R. R. Co.,* 2 I. C. C.

584; *C., R. I. & P. Ry. Co.* v. *C. & A. R. R. Co.*, 3 I. C. C. 450; *N. O. Cotton Exch.* v. *Ill. Cent. R. R. Co.*, 3 I. C. C. 534; *Hamilton* v. *C. R. & O. R. R. Co.*, 4 I. C. C. 3 I. C. C. 482; *Detroit Board* v. *G. T. Ry. Co.*, 2 I. C. C. 315; *Poughkeepsie Iron Co.* v. *N. Y. C. & H. R. R. R. Co.*, 4 I. C. C. 3 I. C. C. 248.

The apportionment of rates of different parts of a through line does not determine the charge to the public, but may be significant on the question of reasonable rates for the whole distance. *Brady* v. *Penn. R. R. Co.*, 2 I. C. C. 131.

A railroad company is under special obligations to give reasonable rates for its local business, but there are many influences, which may affect through rates, while not bearing upon local rates at all, or, if at all, in less degree. *McMorran* v. *Grand Trunk Ry. Co.*, 3 I. C. C. 252; and see also *Martin* v. *C., B. & Q. R. R. Co.*, 2 I. C. C. 25; *Brady* v. *Penn. R. R. Co.*, 2 I. C. C. 131; *In re Investn. of G. T. R. R. Co.*, 3 I. C. C. 89; *United States* v. *Mellen*, 53 Fed. Rep. 229.

Through rates are not required to be made on a mileage basis, nor local rates to correspond with the divisions, citing *Martin* v. *Sou. Pac.*, 2 I. C. C. 1; *Railway Co.* v. *Osborne*, 52 Fed. Rep. 912. See Wentworth on Interstate Commerce, pp. 18, 24, 54; Judson on Interstate Commerce, p. 190, § 150, citing *Chicago &c. R. R. Co.* v. *Tompkins*, 176 U. S. 167; *Allen & Lewis* v. *Oregon R. Nav. Co.*, 98 Fed. Rep. 16.

No power existed at common law, and none is given by the act to court or commission, to compel connecting companies to contract with each other, to abandon full control of their separate roads, or to unite in a joint tariff. *Express Cases*, 117 U. S. 1; *Kentucky Bridge Co.* v. *Louisville & N. R. Co.*, 2 I. C. C. 351; 37 Fed. Rep. 567; *Little Rock & M. R. Co.* v. *St. Louis, I. M. & S. Ry. Co.*, 2 I. C. C. 763; 41 Fed. Rep. 559; *Int. Com. Comm.* v. *Baltimore &*

*O. R. R. Co.,* 145 U. S. 284; *Gulf, C. & S. F. Ry. Co. v. Miami S. S. Co.,* 86 Fed. Rep. 415.

A scheme for establishing compulsory through rates should be surrounded by proper safeguards, and its operation limited by proper restrictions. Cases *supra;* and see *Cincinnati, N. O. & T. R. Ry. Co. v. Int. Com. Comm.,* 162 U. S. 184; *Texas & P. Ry. Co. v. Int. Com. Comm.,* 162 U. S. 197; *Railroad Co. v. Platt* (decided by the Interstate Commerce Commission June 26, 1907); *Sou. Pac. Co. v. Int. Com. Comm.,* 200 U. S. 554; *Int. Com. Comm. v. Baltimore & O. R. Co.,* 3 I. C. C. 192; 43 Fed. Rep. 37; *Cincinnati, N. O. & T. P. R. Co. v. Int. Com. Comm.,* 162 U. S. 184, 197.

Section 6 cannot be construed to prohibit such condition. *Delaware, L. & W. R. Co. v. Kutter,* 147 Fed. Rep. 53.

While contracts which are prohibited by law are invalid and cannot be enforced, there are five exceptions in which the contracts are upheld. Where public policy requires the intervention of the court; where the parties are not *in pari delicto;* where the law which makes the agreement unlawful was intended for the special protection of the party seeking relief; where the illegal purpose has not been consummated; where the party complaining can exhibit his case without relying on the illegal transaction. 9 Cyc. Law & Proc., p. 550; *Packard v. Byrd,* 73 So. Car. 1; *Fox v. Rogers,* 171 Massachusetts, 546; *Eastern Expanded Metal Co. v. Webb Granite Co.* (Mass.), 81 N. E. Rep. 251; *Tootle v. Taylor,* 64 Iowa, 629; *Bemis v. Beecher,* 1 Kansas, 226; *Mason v. McLeod,* 57 Kansas, 105.

To invalidate a contract for illegality, the illegality must be inherent. It is not enough that it be associated even closely. It must be a part of the contract. *Armstrong v. Toler,* 11 Wheat. 258; *Union Nat. Bank v. Matthews,* 98 U. S. 621; *Merchants' Cotton Co. v. Insurance Co.,* 151 U. S. 368; *Larned v. Andrews,* 106 Massachusetts, 435.

The laches of the railroad company in failing to file and publish its joint through rate. after it was made should not enable it to defeat its contract or relieve it from liability under its contract. *Railroad Co.* v. *Hefley*, 158 U. S. 98, distinguished; and see *Virginia Coal & Iron Co.* v. *Louisville & N. R. Co.*, 37 S. E. Rep. 315; *Cherry* v. *Chicago & Alton Ry. Co.*, 191 Missouri, 489; Judson on Interstate Commerce on p. 276, § 235; Chapter on Enforcibility of Unpublished Rate against the Carrier, citing *Pond-Decker Lumber Co.* v. *Spencer*, 86 Fed. Rep. 846, reversing 81 Fed. Rep. 277.

The state court did not find that any preference or advantage was given Forrester Brothers, under its con-tract over that which was given to any other shipper be-tween the same points.

The findings of the state court are conclusive in this court, and while there is no finding of the state court that even the proportional rate with the other roads was filed and published as the Interstate Commerce Law required, yet as the court specifically finds that this grain was not shipped over the same roads or between the same points specified in the proportional tariff offered in evidence in connection with the other roads; and in the amendments to such tariff it is apparent under the authorities already cited in this brief that the proportional rates with other roads, even if filed and published, did not preclude the Kansas City Southern Railway Company from making a different proportional rate with the northern connecting lines.

When the northern connecting lines united on a through rate this new line thus formed was wholly independent of the line formed by the proportional rate between. Leavensworth and Atchison and St. Joseph with other roads. *C. & A. Ry. Co.* v. *United States*, 156 Fed. Rep. 558; *United States* v. *Standard Oil Co.*, 155 Fed. Rep. 305; *Armour Packing Co.* v. *United States*, 153 Fed. Rep. 1, were all brought under the Elkins Act, which act did not

take effect until February 19, 1903; the contract of Forrester Brothers was made in 1901, and the shipments were made in 1901 and 1902.  These cases do not apply, nor does *Texas & Pacific Ry. Co.* v. *Mugg*, 202 U. S. 242.

This court will not review a decision of the state court on a writ of error when the decision of the state court is based on a question of state practice or procedure. *In re Spies*, 123 U. S. 131; *Oxley Stave Co.* v. *Butler Co.*, 166 U. S. 648.

No decision, state or Federal, holds that a contract based on an unpublished rate applicable to the rate of shipment in question can be enforced, as between the carrier and shipper, when the rate is not shown to be unjust and unreasonable or does not discriminate either in favor of or against other shippers on same haul, or does not conflict with a lawfully established rate which is applicable.  The validity of such contracts has been upheld in the following cases: *Mo. Pacif. R. R. Co.* v. *Relf*, 78 Kansas, 463; *Wabash R. R. Co.* v. *Sloop* (Mo.), 98 S. W. Rep. 607; *Southern Kan. R. R. Co.* v. *Burgess* (Tex.), 90 S. W. Rep. 189; *Gulf R. R. Co.* v. *Leatherwood*, 69 S. W. Rep. 119; *Railway Company* v. *Horn* (Tenn.), 59 S. W. Rep. 134; *Laurel Cotton Mills Co.* v. *G. & S. I. R. Co.*, 37 So. Rep. 134; *Southern Pacif. R. R. Co.* v. *Redding*, 43 S. W. Rep. 1061; *Va. Coal & Iron Co.* v. *Louisville N. R. Co.*, 74 S. E. Rep. 315; *Cherry* v. *Chicago & Alton R. Co.*, 191 Missouri, 489; 2 L. R. A. (N. S.) 695; 90 S. W. Rep. 381.

The principle involved in this case comes clearly within the right to contract which has always been recognized by this court.  *Southern Pacific R. R. Co.* v. *Inter. Com. Comm.*, 200 U. S. 555; *Inter. Com. Comm.* v. *Baltimore R. R. Co.*, 3 I. C. C. 192; *Cincinnati, N. O. & T. P. R. Co.* v. *Inter. Com. Comm.*, 162 U. S. 184, 197; 5 I. C. C. 391.

MR. JUSTICE VAN DEVANTER delivered the opinion of the court.

This was a proceeding in garnishment under the laws of the State of Kansas. The C. H. Albers Commission Company had recovered a judgment in the District Court of Crawford County, in that State, against Robert L. Forrester and Joseph M. Forrester, doing business as Forrester Brothers, in the sum of $10,333.72, with interest, and had brought the Kansas City Southern Railway Company into the case, as a garnishee, upon a general allegation that it was indebted to Forrester Brothers. The railway company, which will be spoken of as the garnishee, appeared and denied that allegation. Under the practice in that State the issue so framed was, without other pleadings, brought on for trial as a civil action. The trial was begun before the court and a jury, but later the jury was discharged, with the consent of the parties, and the trial proceeded before the court alone. The case made by the evidence was this:

The garnishee was operating a railroad extending from Kansas City, Missouri, to Texarkana, Texas. Another railroad, which will be spoken of as the northern line, connected with it at Kansas City and extended northward to Omaha, Nebraska. Forrester Brothers were buyers and sellers of grain, with offices at St. Louis, Missouri. In the late summer or early fall of 1901 the two roads, at the solicitation of Forrester Brothers, entered into an oral agreement with the latter whereby they were granted a special rate on corn and oats to be shipped in carload lots from Omaha via Kansas City to Texarkana. The evidence was conflicting as to whether the rate agreed upon for the through haul was 12½ or 16½ cents per hundred pounds, but it was one or the other, and the garnishee was to charge and receive 8 cents for the haul over its road and the remainder was to go to the northern line. The evi-

dence was also conflicting as to whether the agreement was to terminate on the thirty-first of October, or was to continue until all the shipments then contemplated by Forrester Brothers were completed. After the agreement was made, and in reliance thereon, Forrester Brothers made large purchases of corn and oats at Omaha for shipment to and sale at Texarkana, as they had contemplated doing when soliciting the special rate. The agreement was observed by the garnishee until and including the thirty-first of October, and during that time the shipments were carried on through bills of lading. Thereafter the garnishee disregarded the agreement, required that the shipments be rebilled at Kansas City, and collected a 10-cent rate for the haul over its road until November 10, and thereafter a 14-cent rate. The payment of the larger rates was made by an agent of Forrester Brothers at Kansas City, who did not know of the agreement. By exacting the larger rates the garnishee received $10,527.55 more than it would have received under the 8-cent rate. No schedule embodying the 12½ or 16½-cent rate, whichever it was, for the through haul, or the 8-cent rate for the haul over the garnishee's road, was filed with the Interstate Commerce Commission; and neither was any memorandum or statement of the oral agreement so filed. Apart from the agreement there was no joint through rate applicable to these shipments.

When the agreement was made there was in force on the garnishee's road a "proportional rate" of 10 cents per hundred pounds on corn and oats moving from Kansas City to Texarkana. This rate was not applicable to shipments originating at Kansas City, but only to such as originated elsewhere on connecting lines. Nor was it invariably confined to the movement from Kansas City to Texarkana, for it included also the haul, when there was such, to Kansas City from certain common points, such as St. Joseph, Atchison and Leavenworth, which usually

enjoyed the Kansas City rates and were not reached by the garnishee's road, but by other roads. Thus, shipments originating on lines connecting at the common points with the roads leading to Kansas City took this rate from the common points to Texarkana. As applied to such shipments the rate was joint as well as proportional, and as applied to others it was a proportional rate of the garnishee alone. It was embodied in a schedule duly filed with the Interstate Commerce Commission, and remained in force until November 10, when it was superseded by a like rate of 14 cents, shown in an amendatory schedule so filed. These schedules bore a heading indicating that they were adopted by the garnishee "in connection with" other designated railroads, they being the roads over which the haul, when there was such, from the common points to the garnishee's road would be made. The northern line was not one of them, nor was Omaha one of the common points. There was a like provision for the haul, when there was such, from Texarkana to common points therewith, and also a designation of the railroads over which that haul would be made; but as that feature of the schedules is immaterial here, it may be eliminated from consideration.

As explaining a proportional rate and indicating the correct application of the one just named, F. M. King, an experienced station agent of the garnishee, testified: "Q. I will ask if you know whether or not the words 'proportional rates' have a well-defined and understood meaning in railroad business and on the Kansas City Southern. A. They have; yes, sir. Q. Now, just tell briefly what those terms mean, those words 'proportional rates,' if you know. A. A proportional rate is a rate put in to cover business . . . coming to our lines from other points, applying to commodities where we have no through rates. It is put in in order to protect a shipper on a long haul. For instance, a shipment coming from . . . points

out in Kansas, where there is no through rate published, . . . we accept it from the connecting line and bill it out then on a proportional rate, which is less than the local tariff rate. Q. Now, you spoke there of a local tariff rate; if those words have a well-defined meaning, I wish you would state what those are. A. A local rate is a rate applying locally from one station to another on the same road. Q. In that term 'local rate' as distinguished from 'proportional rate,' how about the origin' of the shipment? A. That is where it originates and terminates on the same line." And E. E. Smythe, the general freight agent of the garnishee, under whose direction the schedules embracing this proportional rate were prepared and filed, testified: "Q. Mr. Smythe, what is meant in railroading by 'common points'? A. Common points are points which take the same rate. . . . Q. Common points are comparatively close together, taking the same rates? A. Yes, sir. Q. How far north is Omaha from Kansas City? A. 220 or 226 miles. . . . Q. How far north from Kansas City is Atchison and Leavenworth? A. Between 30 and 40 miles. Q. And St. Joe about 60 miles north of Kansas City? A. Yes, sir, 60. Q. Is Omaha a common point with Leavenworth, Atchison, St. Joe and Kansas City? A. No, sir. . . . Q. Now, Mr. Smythe, I will ask you to state what is known in railroading as 'proportional rates,' what does that expression mean, if it has any fixed or definite meaning? A. Proportional rates are rates established in a great many centers—grain centers, if you please—on grain coming from any territory which may be shipped there for reshipment. . . . Q. I will ask you if the words 'proportional rates' have a fixed and definite meaning among railroad men, especially among traffic men? A. Yes, sir. . . . Q. Can you give us an illustration so we will understand it more definitely? Give your own illustration of shipments coming into Kansas City and

going out again. A. We will take Wichita, Kansas. Some Kansas City firm will buy hay and grain there from a Wichita dealer, or some point in that territory, and ship that hay to Kansas City to John Jones Commission Co. Mr. Jones pays the freight on that car, and in the meantime . . . he may have sold that car of hay or grain to go to New Orleans, . . . and he accordingly comes to you, or presents to the general agent the expense bill covering the freight in, and when that is checked to see that the correct rate is applied it goes out on a proportional rate from Kansas City or any other point where the proportional rate applies, at the proportional rate named in the tariff. . . . Q. Explain in your own way. A. You want me to explain what that tariff [the proportional one now under consideration] means? What it would apply on? Q. Yes, sir, just explain the meaning of this expression 'in connection with the Chicago Great Western' and the other roads. A. That tariff would apply on grain coming into Kansas City on any railroad in America [and bound] to Texarkana. . . . Q. You say it would apply on grain coming into Kansas City from any point in the world? Yes, sir, any place in America." This testimony, bearing upon the meaning of the proportional rate schedules, was not in any way contradicted.

It was not shown whether those schedules were sanctioned by the other railroads over which the haul, when there was such, from the common points to the garnishee's road was to be made; and while it was shown that those schedules were regularly printed and that copies thereof were sent to the freight offices of the garnishee at Kansas City and other points and were there kept open to public inspection, it was not shown that copies were posted in public and conspicuous places in those offices.

Respecting the existence of an applicable local rate on the northern line from Omaha to Kansas City, the witness Smythe testified: "Q. I will ask you to state if you know

what the rate was in 1901 on grain between Omaha and Kansas City? A. Yes, sir. Q. I will ask you to state what it was. A. The rate was 9 cents. Q. Is that what you call a legal rate? A. It was the legal rate; yes, sir. Q. That is, between Omaha and Kansas City? A. Yes, sir. Q. On what roads was that in effect? A. In effect over the Burlington, Missouri Pacific and all lines reaching Omaha running into Kansas City." This testimony was offered and admitted without objection, and its effect was in no way impaired or qualified, save as the same witness, as also others, testified to the existence of a rate of 6½ cents, called the "Missouri arbitrary," on grain carried from Omaha to Kansas City when destined to points beyond. If this latter was an individual rate of the northern line, and not a conventional division of some joint through rate, as to which the testimony was somewhat uncertain, it was applicable to the shipments in question; otherwise the 9-cent rate was applicable. In either event there was a lawful local rate covering the haul over the northern line.

At the trial the plaintiff took the position, not that the proportional rate was unreasonable, preferential, discriminatory or otherwise objectionable under the Interstate Commerce Act, but that the special agreement was valid and the garnishee consequently was under a common law liability to Forrester Brothers for all that it had collected in excess of the stipulated 8-cent rate for the haul over its road. And the garnishee's position, insisted upon throughout the trial, is reflected by the following declarations of law which it tendered and the court rejected:

"Where an interstate shipment of merchandise passes from the point of origin to the point of destination over the lines of two separate carriers, and such carriers have not, by agreement, established a joint rate over their said lines and filed and published the same in the manner required by the Interstate Commerce Act, then the only lawful charge for transportation to be applied to such

shipment is the published tariff rate of the first carrier from the point of origin of the shipment to the point of connection with the second carrier, plus the published tariff charge of the second carrier from the point of connection with the first carrier to the point of destination.

"On interstate shipments of merchandise the only lawful rates applicable thereto are such rates as have been filed and published in the manner required by the Interstate Commerce Act."

And, applying those declarations to the evidence, the garnishee insisted that during the time of the shipments in question lawfully established local rates, applicable thereto, were in force upon the two roads, and that those rates were not superseded or displaced by the special agreement with the shipper; that the rates agreed upon, that is, the joint through rate and the 8-cent rate, never became legally operative, because never embraced in any schedule filed with the Interstate Commerce Commission; and, finally, that the charges exacted for the haul over its road conformed to the lawfully established rate, and were the only charges which lawfully could have been accepted.

The trial court sustained the plaintiff's position, made a general finding in its favor, and entered judgment thereon against the garnishee. The Supreme Court of the State affirmed the finding and judgment (79 Kansas, 59), and this writ of error was then allowed.

Consideration must first be given to a motion to dismiss, advanced upon two grounds: (1) That no right or immunity under a statute of the United States was "specially set up or claimed," within the meaning of Rev. Stat., § 709, in the state courts, and (2) that in those courts the facts were found generally against the garnishee, that the finding is conclusive upon this court, and that the errors assigned, when rightly considered, but challenge the finding, and therefore present nothing which is open to review.

The first ground obviously is not tenable. The garnishee insisted throughout the proceedings that no recovery could be had against it consistently with the Interstate Commerce Act, because in disregarding the agreement for the special rate and in exacting the proportional rate, first of 10 and later of 14 cents, it but conformed to the provisions of that act governing the rates to be applied to interstate shipments. This was an adequate assertion of a right or immunity under that act, for it named the act, indicated wherein it was claimed to be applicable, and invoked its protection. *Nutt* v. *Knut*, 200 U. S. 12; *Texas and Pacific Railway Co.* v. *Abilene Cotton Oil Co.*, 204 U. S. 426.

The second ground has more color, but is also untenable. While it is true that upon a writ of error to a state court we cannot review its decision upon pure questions of fact, but only upon questions of law bearing upon the Federal right set up by the unsuccessful party, it equally is true that we may examine the entire record, including the evidence, if properly incorporated therein, to determine whether what purports to be a finding upon questions of fact is so involved with and dependent upon such questions of law as to be in substance and effect a decision of the latter. That this is so is amply shown by our prior rulings. Thus, in *Mackay* v. *Dillon*, 4 How. 421, 447, where the state courts had given to certain evidence an effect claimed to be unwarranted by an applicable law of Congress, it was held that their decision "on the effect of such evidence may be fully considered here." In *Dower* v. *Richards*, 151 U. S. 658, 667, where the conclusiveness of findings of fact by a state court was elaborately considered, it was recognized that where the question is "of the competency and legal effect of the evidence as bearing upon a question of Federal law the decision may be reviewed by this court." In *Stanley* v. *Schwalby*, 162 U. S. 255, 274, 277–279, which was an action of eject-

ment, the validity of an authority exercised under the
United States was drawn in question and depended upon
whether the United States had a good title to the land in
controversy.   That question turned upon whether the
attorney for the United States, who had represented it
in the acquisition of the land, knew at the time of a prior
deed to one McMillan, and the state court found that he
had such knowledge.   In this court it was insisted, on
the one hand, that the finding was conclusive, and, on
the other, that the evidence was insufficient, as matter
of law, to warrant the finding, and could be examined to
determine whether this was so.   In that connection this
court, although recognizing the general rule that findings
upon pure questions of fact are not open to review, said
(p. 278): "But so far as the judgment of the state court
against the validity of an authority set up by the de-
fendants under the United States necessarily involves the
decision of a question of law, it must be reviewed by this
court, whether that question depends upon the Consti-
tution, laws or treaties of the United States, or upon the
local law, or upon principles of general jurisprudence."
And, upon examining the evidence, this court held it
to be "wholly insufficient, in fact and in law, to support
the conclusion that the attorney had any notice of the
previous deed to McMillan," and accordingly reversed
the judgment of the state court.   And in *Schlemmer* v.
*Buffalo, Rochester & Pittsburg Ry. Co.,* 205 U. S. 1, a case
arising under the Federal Safety Appliance Law, wherein
the state court found that the deceased contributed to
his injury by his own negligence, thereby preventing a
recovery, this court exercised the power to examine the
evidence, notwithstanding a contention that the finding
was conclusive, and reversed the judgment upon the
ground that it appeared that what had been found to be
contributory negligence was at most an assumption of
the risk, which was not a defense under the Federal stat-

ute. Perhaps the most frequent exercise of this power occurs in cases arising under the clause of the Constitution forbidding a State to pass any law impairing the obligation of a contract, the existence of the contract in such cases being a mixed question of law and fact. *Louisville Gas Co.* v. *Citizens' Gas Co.*, 115 U. S. 683, 697, a leading case upon the subject, contains this statement of the settled rule: "Whether an alleged contract arises from state legislation, or by agreement with the agents of a State, by its authority, or by stipulations between individuals exclusively, we are obliged, upon our own judgment and independently of the adjudication of the state court, to decide whether there exists a contract within the protection of the Constitution of the United States." A like exercise of this power is shown in cases arising under the clause of the Constitution requiring full faith and credit to be given in each State to the judicial proceedings of every other State. *Huntington* v. *Attrill*, 146 U. S. 657, 684, was such a case. It was a suit in Maryland upon a judgment obtained in New York under a statute of the latter State imposing a liability for the debts of a corporation upon a director making a false certificate respecting its condition. The Court of Appeals of Maryland held that the judgment was for a strictly penal liability and therefore not within the protection of the full faith and credit clause. But when the case came here it was held that "if the state court declines to give full faith and credit to a judgment of another State, because of its opinion as to the nature of the cause of action on which the judgment was recovered, this court, in determining whether full faith and credit have been given to that judgment, must decide for itself the nature of the original liability." And upon reaching the conclusion that in that instance the original liability was not strictly penal this court reversed the judgment of the Court of Appeals of Maryland.

When due regard is had for the rule before indicated, and so often applied in other cases, it does not admit of doubt that in the present case we may examine the evidence, which has been properly incorporated in the record, to determine whether the general finding necessarily involved the decision of questions of law bearing upon the Federal right set up by the garnishee. And when this is done it is manifest, as is amply illustrated by the résumé which we have given of the evidence and contentions of the parties, that the finding necessarily involved the decision of questions of the interpretation and application of the Interstate Commerce Act (24 Stat. 379, c. 104; 25 Stat. 855, c. 382), and also of other questions of law bearing upon the Federal right, such as the legal effect of evidence.

Coming then to the questions arising upon the case made by the evidence, we have seen that when the agreement for the special rate was made, and during the time of the shipments in question, there was in force on the garnishee's road a lawful proportional rate, at first of 10 and later of 14 cents, applicable to these shipments, unless it was objectionable in some of the following particulars:

(a) Although it was shown that the schedules embodying this rate were regularly printed, duly filed with the Interstate Commerce Commission, and kept open to public inspection at the freight offices of the garnishee at Kansas City and other points, it was not shown that copies were posted in public and conspicuous places in those offices as required by § 6 of the Interstate Commerce Act. Posting, however, was not essential to make rates legally operative, and was required only as a means of affording special facilities to the public for ascertaining the rates *actually in force*. *Texas and Pacific Railway Co. v. Cisco Oil Mill*, 204 U. S. 449.

(b) It was not shown that these schedules were sanctioned by the other railroads designated therein, they

being the roads over which the haul to the garnishee's road from the common points was to be made when the shipments were received from connecting lines at those points. Such a showing, however, was not necessary here. The other roads had no interest in the rate as applied to shipments received by the garnishee from the northern line at Kansas City, as were the shipments in question. As applied to them the rate was not joint, but an individual rate of the garnishee. The sanction of the other roads was essential only to its application to the haul from the common points, when there was such.

(c) As before stated, the heading of these schedules indicated that they were adopted by the garnishee "in connection with" other designated railroads, they being the ones just mentioned as interested in the rate when applied to shipments received from connecting lines at the common points. This, it is contended, meant that the rate was applicable only to shipments received by the garnishee from those roads. But an examination of the schedules satisfies us that they had no such meaning. The heading merely reflected the fact that the rate, in some of its applications, was to be a joint one as between the garnishee and the designated roads. The schedules themselves did not restrict the rate to shipments received from those roads, but, on the contrary, indicated that it was applicable to shipments received by the garnishee at Kansas City from any connecting line. This view of it was fortified, unnecessarily, as we think, by the uncontradicted testimony of expert witnesses, who declared that the rate was applicable to shipments originating on any connecting line, whether received by the garnishee at Kansas City or by one of the designated roads at a common point.

The uncontradicted testimony of witnesses likely to be informed on the subject disclosed the existence of an applicable lawful rate on the northern line from Omaha to

Kansas City. True, this testimony was not the best evidence, but, being offered and admitted without objection, it was evidence which could not be disregarded. *Diaz* v. *United States*, 222 U. S. 574; *Schlemmer* v. *Buffalo, Rochester & Pittsburg Railway Co.*, 205 U. S. 1, 9; *United States* v. *McCoy*, 193 U. S. 593, 598. And while it may have been left somewhat uncertain as to which of two such rates, one of 6½ and the other of 9 cents, was the applicable one, it was disclosed with certainty that it was one or the other.

Such being the state of the evidence, the necessary conclusion, as matter of law, is that an applicable and lawfully established local rate was in force on each road. And as it was conceded that there was no established joint through rate, it likewise is a necessary conclusion that the shipments, even if moving on through bills of lading, should have taken these local rates, unless the latter were superseded or displaced by the special agreement.

We are thus brought to the question of the validity of that agreement. Not only did it contemplate a departure from the established local rates for the benefit of a single shipper, but no schedule embracing the rates agreed upon was filed with the Interstate Commerce Commission. Section 6 of the Interstate Commerce Act, as it existed at the time, laid upon every carrier subject to the provisions of the act the duty of filing with the Commission and publishing schedules of the rates to be charged for the transportation of property over its road, provided for changing and superseding such rates by new schedules so filed and published, and made it unlawful for such a carrier to depart from any rate so established and in force at the time. That section also required connecting carriers, agreeing upon joint through rates, to file schedules thereof with the Commission, made similar provision for changing and superseding rates so established, and like-

⠄⠄ ⡇⠄ ⠄

wise prohibited any deviation from an established joint rate while remaining in force. Other sections contained provisions against unreasonable rates, unjust discriminations, undue preferences and the like. The chief purpose of the act was to secure uniformity of treatment to all, to suppress unjust discriminations and undue preferences, and to prevent special and secret agreements, in respect of rates for interstate transportation, and to that end to require that such rates be established in a manner calculated to give them publicity, to make them inflexible while in force, and to cause them to be unalterable save in the mode prescribed. In every substantial sense local rates and joint through rates were placed on the same level. Both were required to be openly established and uniformly applied. True, the carriers were obliged to establish local rates and were left free to agree upon joint through rates, or not, as they chose; but if they did agree thereon, the rates could become legally operative only by being established as prescribed in the act. The true effect of the statute in this regard—we speak of the statute as it existed in 1901—is clearly stated in the opinion of the Circuit Court of Appeals for the Eighth Circuit, in *Chicago, Burlington & Quincy Railway Co.* v. *United States,* 157 Fed. Rep. 830, 833, as follows:

"If an initial carrier accepts traffic for transportation and issues its bill of lading over a route made up of connecting roads for which no joint through rate has been published and filed with the commission, the lawful rate to be charged is the sum of the established local rates published and filed by the individual roads; or if, as was the case here, there is a local rate over one road and a joint rate over the others for the remainder of the route, all published and filed with the commission, the lawful through rate to be charged is the sum of the local and joint rates. By failing to establish or concur in a joint through rate for traffic accepted for interstate transporta-

tion, each participating carrier impliedly asserts that the rate which it has duly established, published, and filed for its own. line shall be a component part of the through rate to be charged. It is competent for carriers, if conditions justify it, to make their proportions of a through rate less than the local charges upon their own lines, but in doing so they should observe legal methods, and if no action to that end is taken they in effect adhere to the rates established, published, and filed by them as applying not only to local but to through traffic."

We conclude, as matter of law, that the special agreement was void, that the established local rates were unaffected by it, that the rate collected by the garnishee was the applicable legal rate, and that the finding and judgment should have been in favor of, and not against, the garnishee.

To avoid any misapprehension in respect to the character of the liability sought to be enforced in this case, we deem it well to repeat that there was no claim of any right to reparation or damages under the Interstate Commerce Act, and no claim that the rate collected was unreasonable, preferential, discriminatory or otherwise violative of that act, but only an attempt to enforce a supposed liability for a breach of the special agreement. See *Texas and Pacific Railway Co.* v. *Abilene Cotton Oil Co.,* 204 U. S. 426; *Robinson* v. *Baltimore and Ohio Railroad Co.,* 222 U. S. 506.

For the reasons given the judgment of the Supreme Court of Kansas is reversed, and the cause is remanded for further proceedings not inconsistent with this opinion.

*Judgment reversed.*