**Florence Blaize EPHRAIM, Plaintiff-Appellee,**

v.

**SAFEWAY TRAILS, INC., Defendant-Appellant.**

**No. 124, Docket 29064.**

United States Court of Appeals Second Circuit.

Argued Oct. 28, 1964.

Decided Feb. 23, 1965.

Marshall, Circuit Judge, dissented.

Clarence B. Jones, New York City (Charles T. McKinney, Jonathan W. Lubell, Lubell, Lubell & Jones, New York City, on the brief), for plaintiff-appellee.

Henry S. Miller, New York City (Charles B. McInnis, Roberts & McInnis, Washington, D. C., on the brief), for defendant-appellant.

Before LUMBARD, Chief Judge and HAYS and MARSHALL, Circuit Judges.

LUMBARD, Chief Judge:

Safeway Trails, Inc., appeals from a judgment rendered against it in the Southern District of New York in favor of Florence Ephraim for personal injuries suffered by her arising out of an assault while riding in Georgia on the bus of a connecting carrier, Southern Stages, Inc.[1] For reasons indicated herein, we find that the initial carrier, Safeway Trails, which sold the through ticket, cannot be held liable for the culpable actions of the connecting carrier and accordingly we reverse the judgment below.

As plaintiff was successful below, we take the facts in the light most favorable to her. Plaintiff is a Negro woman, residing in New York. On July 31, 1959, she purchased a round trip bus ticket between New York and Montgomery, Alabama, from a Safeway Trails' ticket agent in the Port Authority Bus Terminal in New York City. She received a strip of detachable ticket stubs, each stub good for a particular portion of the trip over connecting bus lines. Each ticket stated

1. The opinion of Cashin, J., is reported at 230 F.Supp. 568 (SDNY 1964).

that it was sold "for account of [Safeway Trails]." The back of each ticket contained the following exculpatory clause:

"In selling this ticket and checking baggage thereon the selling carrier acts only as agent and is not responsible beyond its own line and does not assume expense of transfer at any junction or guarantee any connections."

As more fully set forth below, ten per cent of the proceeds of the sale of Southern Stages' tickets was retained by Safeway Trails, all of which ten per cent was turned over to the Port Authority.

Safeway Trails operates buses as far south as Washington, D. C. (It was undisputed that Safeway Trails operated, but did not own the bus on which Mrs. Ephraim traveled to Washington.) South of Washington, plaintiff's route took her over the lines of five connecting carriers.[2] Safeway Trails sold the tickets for the complete trip on each of the connecting carriers. Mrs. Ephraim also secured a reservation coupon for seat 34 on the bus as far south as Raleigh, North Carolina.

Mrs. Ephraim commenced her trip in New York in August 1959, on a bus operated by Safeway Trails. Drivers were changed at Washington, as the bus left the line of the Safeway Trails. In Raleigh, North Carolina, there was a change of both bus and driver. After boarding the new bus, plaintiff inquired about her seat and the driver told her, "Lady, on this bus you sit anywhere." Later there was another change of drivers in South Carolina.

While the bus was traveling through Georgia, on the line of Southern Stages, a white woman with two children boarded the bus. After receiving a complaint from the woman that there were no vacant seats in the front of the bus, the driver requested Mrs. Ephraim to move to one of the vacant seats in the rear of the bus. Plaintiff refused as did Mrs. Benjamin, a Negro woman in the adjacent seat. The driver told the white woman that he would "make a phone call," left the bus and returned about five minutes later. Sometime later, when the bus stopped at Warrenton, Georgia, the driver got off the bus and returned shortly with a man who was carrying a club and a pistol and who appeared to be a policeman. The bus driver pointed out Mrs. Ephraim and Mrs. Benjamin as "those two colored girls." The policeman ordered Mrs. Benjamin to the rear of the bus and she promptly complied. He then awoke Mrs. Ephraim, who had been sleeping, and when she refused to go to the rear of the bus, he pulled on her sweater and told her to leave the bus. As she started to obey this order, the officer pushed her down the aisle and when she reached the stairwell clubbed her on the head, knocking her off the bus. When she regained consciousness, she was beaten further, subjected to verbal abuse regarding her race and threatened with death by two white men, one of whom was the policeman who had removed her from the bus. When Mrs. Benjamin attempted to get off the bus to aid the plaintiff, the bus driver closed the door and drove off. As the plaintiff was bleeding profusely, she was taken to a hospital where she spent the next two days. Upon leaving the hospital she proceeded the same day to Montgomery, Alabama, on a visit unrelated to this claim and then returned to New York City.

Plaintiff commenced this diversity action against Safeway Trails in the South-

---

2. On her trip from New York City to Montgomery, Alabama, Mrs. Ephraim was scheduled to travel on the line of defendant Safeway Trails, Inc. from New York to Washington, D. C.; from Washington, D. C. to Richmond, Virginia, on the line of Virginia Stage Lines, Inc.; from Richmond, Virginia, to Fayetteville, North Carolina, on the line of the Caro-

lina Coach Company; from Fayetteville, North Carolina, to Augusta, Georgia, on the line of the Queens City Coach Company; from Augusta to Columbus, Georgia, on the line of Southern Stages, Inc.; and from Columbus, Georgia, to Montgomery, Alabama, on the line of Capital Motor Lines, Inc.

ern District of New York.[3] Southern Stages, on whose line the incident occurred, was not joined as a party. After a trial without a jury, Judge Cashin granted judgment for the plaintiff for $5,000.

Plaintiff must overcome two legal hurdles in order to succeed on her claim. First, she must show that the initial carrier, Safeway Trails, can be held liable for acts committed on the lines of the connecting carrier, Southern Stages, although there was no culpable act on the part of Safeway Trails. Second, she must show that the bus line may be held liable for the torts of a police officer acting pursuant to the request of the carrier. See Matthews v. Southern Ry. System, 81 U.S.App.D.C. 263, 157 F.2d 609 (1946). As we find the first issue dispositive of the case, it is unnecessary to consider the second.

■■ It is well settled that, absent a finding of fault on its part, an initial carrier may not be held liable for the torts of a connecting carrier committed on the line of the connecting carrier. This has been the rule in cases involving interstate transportation since the decision of the Supreme Court in Louisville & N. R. R. v. Chatters, 279 U.S. 320, 49 S.Ct. 329, 73 L.Ed. 711 (1929). Chatters holds that in addition to this general presumption against the finding of liability on the part of the innocent initial carrier, such carrier may limit its liability for acts of connecting carriers committed on the latter's lines by notations on its tickets and by filing the appropriate tariff with the Interstate Commerce Commission, pursuant to 49 U.S.C. § 6(1). Safeway Trails had taken these steps to limit its liability. As indicated above, exculpatory language was printed on the reverse side of each ticket. The front of each ticket states that it is "Subject to Tariff Regulations." Rule 6(4) of § A3 of the Rules and Regula-

tions of National Passenger Tariff No. A–1000 filed on behalf of Safeway Trails with the Interstate Commerce Commission provides as follows:

"In issuing tickets and checking baggage under tariffs subject hereto for baggage over the lines of other carriers participating in such tariff, the issuing carriers shown in such tariff act only as agents and do not assume responsibility for transportation over the lines of other carriers except as responsibility may be imposed by law with respect to baggage."

■ Without more, under the general rule of the Chatters case and the tariff and form of ticket used by Safeway Trails, no liability may be imposed on Safeway Trails for the acts committed while the plaintiff was traveling on the lines of Southern Stages. Spears v. Transcontinental Bus System, 226 F.2d 94 (9 Cir. 1955); Solomon v. Pennsylvania R. R., 96 F.Supp. 709 (SDNY 1951); Glaser v. Pennsylvania R. R., 82 N.J.Super. 16, 196 A.2d 539 (1963); Berry v. Pennsylvania R. R., 80 N.J. Super. 321, 193 A.2d 569 (1963); Louisville & N. R. R. v. Webb, 248 S.W.2d 429 (Ky.1952).

However, the district court found three "other factors" which induced it to find that the limitation of liability was not effective as against the plaintiff on the theory that Southern Stages was acting as agent for Safeway Trails: (1) ten per cent of the proceeds of the sale of tickets for trips aboard other carriers was retained by Safeway Trails as commission; (2) representations were made to plaintiff that the company had undertaken the responsibility of transporting plaintiff to her destination; (3) each ticket stated that it was sold "for account of [Safeway Trails]." The record does not support these conclusions and we find no reason

---

3. Jurisdiction is based on diversity of citizenship. 28 U.S.C. § 1332. Plaintiff is a naturalized citizen of the United States and a citizen of the State of New York. Defendant is a corporation organized un-

der the laws of Maryland, with its principal place of business in Washington, D. C., and licensed to do business in New York.

why the Chatters case is not controlling here.

■ As a convenience to passengers, Safeway Trails sells through tickets for trips on connecting carriers, as undoubtedly they, in their turn, do for trips on the lines of Safeway Trails. The selling carriers are merely ticket agents. While we could imagine a situation where a retention of funds might signify that the ticket seller was acting as the principal of the connecting carrier (e. g., if the connecting carrier received funds to cover its expenses, while the selling carrier retained the balance as profit), that is not the situation here. Safeway Trails retained a flat ten per cent of the proceeds of the sale of tickets for transportation over connecting lines, and uncontroverted evidence at trial indicated that the entire ten per cent withheld by Safeway Trails was turned over to the Port Authority pursuant to an agreement whereby the Authority, as compensation for the use of its facilities, would receive ten per cent of all revenues collected by Safeway Trails, whether for trips over its own lines or over lines of other carriers. On these facts it is clear that Safeway Trails acted merely as the agent for the other carriers in selling tickets for trips over their lines. It assumed no responsibility and cannot be held liable for how the connecting lines operated their buses and treated the passengers.

■ The district court's conclusion that "there were representations made to plaintiff that this defendant had undertaken the responsibility of transporting plaintiff to her destination" is not supported by the evidence. Plaintiff testified that:

"I was particular about reservations, whether I would be assured of a reservation on the bus throughout the trip. That was my main worry, and whether there were any problems, because having read other things I wanted to be assured, it was my maiden trip.

"He [the ticket agent] said that on the interstate buses you get reservations and there is no problem.

\* \* \* \* \* \*

"The problem is whether I would get a seat or reservation which would be mine throughout the trip, and I was assured and I was given a reservation."

In fact, plaintiff was given a reservation only to Raleigh, North Carolina. Upon changing buses at Raleigh, Mrs. Ephraim was told by the driver that she could take any seat on the bus. She proceeded to take a seat which was not the one reserved for her on the first bus. This evidence does not warrant the inference that the plaintiff was promised that the bus company would guarantee her safe passage throughout the journey on lines other than those operated by Safeway Trails.

■ Nor does the fact that the ticket stated that it was sold "for account of" Safeway Trails make Safeway Trails responsible for what occurred in Georgia. The statement was printed on each ticket and signified only that the connecting carrier could claim its fare from Safeway Trails after the ticket had been presented by the passenger. It did not, nor could it reasonably be read to, impose liability on Safeway Trails to indicate to the purchaser that the company was undertaking to warrant the safety of the passenger on the entire trip.

■ The application of the Chatters holding to the instant case is consistent with the goals of the Interstate Commerce Act. Among the chief objects of § 6 of the Act is the establishment of certainty in rate charges and the prevention of "special" agreements between the carrier and individual customers. Kansas City So. Ry. v. C. H. Albers Commission Co., 223 U.S. 573, 597, 32 S.Ct. 316, 56 L.Ed. 556 (1912). The terms of a duly filed tariff may not be waived by the parties. See Lowden v. Simonds-Shields-Lonsdale Grain Co., 306 U.S. 516, 520, 59 S.Ct. 612, 83 L.Ed. 953 (1939); but see Battle v. Central Greyhound Lines, Inc., 171 Misc. 517, 13 N.Y.S.2d 357 (S.Ct. 1939). Safeway Trails, pursuant to the Chatters opinion, filed a tariff to protect itself from liability for torts committed

on the lines of connecting carriers, without any fault on its part. The facts, taken most favorably to Mrs. Ephraim, do not warrant a finding of a "special" agreement between Mrs. Ephraim and Safeway Trails, contrary to the terms of the tariff and the rule in Chatters. The unhappy consequences which befell Mrs. Ephraim were in no way due to the fault of Safeway Trails and the judgment against it cannot stand.

The judgment is reversed. The district court is directed to dismiss the complaint.

MARSHALL, Circuit Judge (dissenting):

I respectfully dissent. The majority relies on Louisville & N. R. R. v. Chatters, 279 U.S. 320, 49 S.Ct. 329, 73 L.Ed. 711 (1929). However, the facts in this case are sufficiently distinguishable so that I am compelled to find Chatters not controlling here.

In Chatters the trial court had jurisdiction over both of the carriers. Here it appears the connecting carrier is outside the jurisdiction of the trial court. In Chatters the plaintiff was able to maintain an action against the connecting carrier in the district court in the city where he resided and purchased the ticket. Here the plaintiff, in order to obtain redress, would be relegated to traveling back to the area where she had been subjected to the brutal beating by law enforcement officials.

In Chatters the limitation clause printed on the ticket read "In selling this ticket and checking baggage thereon the selling carrier acts only as agent and is not responsible beyond its own lines." The limitation clause in this case is not nearly as precise:

Company reserves right to seat all passengers. Not responsible for damage to or loss of checked baggage to exceed $25 unless insured. No responsibility accepted for unchecked baggage. In selling this ticket and checking baggage thereon the selling carrier acts only as agent and is not responsible beyond its own line and does not assume expense of transfer at any junction point or guarantee any connections.

Any casual reading of this limitation by the layman would lead to the conclusion that the limitation is upon recovery for loss of or damage to baggage.

In this case there is a complete lack of proof that appellee ever knew she was to be transported "beyond * * * [appellant's] own line." There is, of course, no testimony that anyone told her she was to use other carriers during the trip. She was told that she would change buses in Raleigh, North Carolina. But instead of being told that this would be due to a change of carriers she was told the change was necessary because the buses had to be cleaned after such a long journey.

The ticket coupons did not give any notice that there would be a change of carriers, or that appellant lines would not take her all the way to Montgomery. Each coupon had spaces to be filled in after the following printed symbols: "From," "To," "Via," "Orig." and "Dest." The ticket was filled in automatically by a machine. The ticket purchased by appellee contained the following notations filled in by the machine: First coupon: From New York to Washington, D. C. via STs; Second coupon: From Washington, D. C. to Richmond, Virginia via VAT; Third coupon: Richmond, Va. to Fayetteville, N. C. via CCC; Fourth coupon: Fayetteville, N. C., to Augusta, Ga. via QCC; Fifth coupon: From Augusta, Ga. to Columbus, Ga. via SOS; Sixth coupon: From Columbus, Ga. to Montgomery, Ala. via [not filled in]. The other six coupons for use on the return trip were in reverse with similar notations.

Certainly the average person could not be charged with knowing that STs meant Safeway Trails, Inc.; that VAT meant Virginia Stage Lines, Inc.; that CCC meant Carolina Coach Co.; that QCC meant Queens City Coach Co.; that SOS meant Southern Stages, Inc.; or what the blank space meant in the last coupon.

Indeed, appellee when cross-examined as to what she understood SOS to mean, replied "I know it is a distress sign, that is all I know SOS to mean." On the other hand, each coupon had printed clearly on the top: "Issued by Trailways New York Terminal"; the map of the United States with the words "National Trailways Bus System" across it; and "Orig. New York, N. Y." and "Dest. Montgomery, Ala."

Appellant's exhibit E is a timetable consisting of 107 pages entitled "Trailways Bus Time Tables." One cover shows a picture of four buses with "Trailways East Coast Limiteds" printed underneath followed by the following in large bold type:

"TRAILWAYS NEW FLEET provides THRU-LIMITEDS

between

New York–Raleigh–Charlotte–Augusta–Tampa
Boston–New York–Washington–Norfolk and Raleigh
Norfolk–Chattanooga–Memphis.
Norfolk–Montgomery–Dallas
Norfolk–Washington–Scranton. Raleigh–Atlanta–Dallas
Miami–Atlanta–Cincinnati–Chicago and Miami–Dallas"

---

The back cover shows the insignia on the map of the United States and pictures of two buses marked "Trailways." Inside are detailed timetables covering 2800 cities covering the area bounded by Portland, Maine, Chicago, Illinois, New Orleans, Louisiana and Miami, Florida. In the center of the timetable is a map covering the area and containing the following legend: "Trailways Eastern Lines Including Connecting Trailways Lines"; below is the word "Thruliner" beside a double line and "Connecting Routes" beside a single line. An examination of the map reveals that appellee's route followed the double line—the route of the "Thruliner."

A reading of appellee's testimony of the colloquy between her and appellant's ticket agent reveals that in requesting a reserved seat for the entire trip she assumed she was dealing with a single carrier. The limitation printed on the back of the coupon had no significance unless appellee knew or should have known that the trip would be over lines "beyond its own line." Cf. New York,

N. H. & Hart. R. R. v. Nothnagle, 346 U.S. 128, 136–37, 73 S.Ct. 986, 97 L.Ed. 1500 (1953). There is positive testimony that she did not know this. There is no evidence that she should have known this.

The bus driver was the catalyst in the incident that resulted in injuries to appellee and this incident arose when appellee refused to change her seat on the bus while in Georgia. This is exactly what she was afraid of.[1] Appellee, in testifying as to this conversation with the ticket agent, stated: "It was just general conversation about the bus. I was particular about reservations, whether I would be assured a reservation on the bus throughout the trip. This was my main worry, and whether there were any problems, because having read other things, I wanted to be assured, it was my maiden trip. He said that on the interstate buses you get reservations and there is no problem."

I would, therefore, affirm the judgment below.

---

1. Sufficient to say that her concern was not without foundation. Enforced racial segregation on interstate buses was so widespread as to cause national and international concern. See Discrimination in Operations of Interstate Motor Carriers of Passengers, 86 M.C.C. 743 (1961).