Railway Co. v. Albers.

# The Kansas City Southern Railway Company v. The C. H. Albers Commission Company.*

## No. 15,627.   (99 Pac. 819.)

### SYLLABUS BY THE COURT.

1. RAILROADS—*Connecting Lines—Interstate Shipments—Joint Rates—Validity of Contract.* In September, 1901, it was not unlawful for connecting railroad lines to make a joint rate with a shipper for the transportation of grain from one state to another, and a contract of this character was valid and binding upon the parties thereto if there was no established rate under the provisions of the interstate commerce act in force which applied to such traffic.

2. —————— *Action to Recover Overcharges—Burden of Proving Contract Invalid.* Where such a contract was entered into, and after it was performed the shipper commenced an action to recover from one of the railroad companies a sum claimed to be overcharges paid to such company upon its proportion of the rate agreed upon, and the railroad company, to avoid payment, claimed that the contract was unlawful and void, the burden of proof was upon it to establish the facts which constituted such invalidity.

3. —————— *Joint Rates by Connecting Carriers—Validity of Contract.* The general rule that where connecting roads, each having a legally established local rate, but no joint rate which has been filed and published as required by law, can not by contract make a joint rate for less than the sum of the two locals has no application where such roads have no established local rates.

4. —————— *Joint-rate Contract Not Affected by One Carrier Establishing a Joint Rate with Other Carriers.* Where connecting railroads enter into a valid contract with a shipper to transport grain from one state to another at a stipulated joint rate, in which agreement the proportion of such rate to be received by each road is specified, one of such roads can not afterward change the amount which it is to receive under such contract by joining with other connecting lines in establishing a joint rate with them by which it secures a larger sum for the transportation of similar freight between the same points named in the former agreement.

5. —————— *Failure to Publish and Report to Interstate Commerce Commission Joint-rate Stipulation.* In September, 1901, cer-

* Pending in the supreme court of the United States on a writ of error allowed February 16, 1909.

tain connecting railroads entered into a contract with a grain dealer whereby they agreed to transport grain for him from Omaha, Neb., to Texarkana, Tex., through Kansas City, Mo., at a stipulated joint rate. No legally established joint rate was then in force on these roads between the points named. The contract specified the proportion of the stipulated rate each road was to receive. A large amount of grain was shipped over these roads at this rate. The rate was not established as required by law. Afterward the shipper commenced an action against one of the roads to recover overcharges paid to it upon its proportion of such rate for such shipment. *Held*, that the failure to establish the rate as required by law can not be interposed as a bar to the action.

6. JURISDICTION — *Interstate Commerce* — *Recovery of Overcharges—Contract.* The exclusive jurisdiction conferred upon federal courts in all actions for violations of the interstate commerce law does not apply to an action to recover overcharges paid upon shipments made under a contract which was not made in violation of that act.

7. PRACTICE, SUPREME COURT—*Findings Included in Judgment —Evidence—Presumption.* Where a case is tried in the district court without a jury and no special findings of fact are filed, this court will assume that every fact necessary to support the judgment rendered was sustained by the evidence to the satisfaction of the court, if there is any substantial evidence in the record tending to sustain such facts.

8. RAILROADS—*Transportation Charges—Payment—Recovery of Overcharges.* A common carrier contracted with a grain dealer to transport a large quantity of grain from Omaha, Neb., to Texarkana, Tex., through Kansas City, Mo., at a stipulated rate. The shipper had an agent at Kansas City, who paid freight bills and collected for grain sold. A large amount of grain was shipped under this rate. The agent at Kansas City did not know what the freight contract was, and paid the shipping-bills as presented without question, supposing that they were correct. The bills, when paid, were forwarded to the shipper. Many of them were excessive. This fact was not discovered for some time, and then the matter was taken up by the shipper and the principal traffic officers of the common carrier. A part of the overcharges were refunded, and under promise that the whole matter would be adjusted the question was postponed from time to time, when further payment by the carrier was refused. *Held*, that the payment was not a voluntary payment such as will bar a recovery of the overcharges still retained by the carrier.

Railway Co. v. Albers.

Error from Crawford district court; ARTHUR FULLER, judge. Opinion filed December 12, 1908. Affirmed. Opinion denying a petition for a rehearing filed February 6, 1909.

## STATEMENT.

THIS action was commenced in the district court of Crawford county by the C. Albers Commission Company to recover a judgment against Robert L. Forrester and Joseph M. Forrester, partners doing business under the firm name of Forrester Brothers. The Kansas City Southern Railway Company was garnisheed, the plaintiff claiming that the railway company was indebted to Forrester Brothers for overpayments made by them upon shipments of grain made over its road. The railway company denied liability, and this question constitutes the matter in controversy. Judgment was entered against the railway company, and it brings the case here by petition in error. The facts out of which the dispute arose are as follow:

Forrester Brothers were engaged in buying grain in the vicinity of Omaha, Council Bluffs, and other northern points, and shipping it to Texarkana, Shreveport and other southern points for sale. They had agents employed to buy and ship the grain, and others to sell it at the points of destination. They also had a financial agent located in Kansas City, Mo., through whom payments and collections were made. Shipment was made from Omaha and other points through Kansas City, Mo. Before making any contracts for grain Forrester Brothers sent their agent, C. D. Fisher, to ascertain what could be done in obtaining a freight rate for their contemplated shipments. Fisher saw E. D. Schaufler, who was the freight-traffic manager for what was called the "northern connecting lines," which comprise three roads running from Omaha, Council Bluffs, and other points, to Kansas City, Mo. After some negotiation with the freight officers of the Kan-

sas City Southern Railway Company a rate was agreed upon, whereby the roads represented by Schaufler and the Kansas City Southern Railway Company agreed to carry the grain at a joint rate of sixteen and one-half cents a hundred from Omaha, Council Bluffs, and common points, through Kansas City, Mo., to Texarkana, and other common points. The Kansas City Southern company was to receive the freight at Kansas City, Mo., and take it to the point of destination for eight cents per hundred, that being its agreed proportion of the joint rate. It was further agreed that the grain should be "billed through" from the point of shipment to the point of destination. In this contract, which was oral, no specific agreement was made as to the amount of grain to be shipped, nor how long the joint rate agreed upon should continue. Very soon after this contract was made Fisher, for Forrester Brothers, made a demand on the companies for 500 cars. They were unable to furnish them at once, but promised to do so as rapidly as possible, and they did furnish and there were used over 400 cars. Shipment on this rate began in August or September, 1901, and for a time the cars were "billed through," but from considerations of convenience they soon began to reship at Kansas City, Mo. The financial agent for Forrester Brothers at Kansas City, Mo., was the Kaw Grain and Elevator Company, and it paid the freight bills to Kansas City upon arrival there, and paid the Kansas City Southern when reshipment was made. After October 31, 1901, the Kansas City Southern demanded and received ten cents per hundred instead of eight cents, and on a part of the grain shipped collected fourteen and fourteen and one-half cents per hundred.

At the time the joint rate was made the northern connecting lines represented by Schaufler had no legally established rate to Kansas City, Mo., and the Kansas City Southern had no rate from Kansas City south which applied to freight shipped over the lines known

as the northern connecting lines and represented by Schaufler. On October 31, 1901, the Kansas City Southern Railway Company, in connection with the Chicago & Great Western Railway Company and other lines, established a joint rate for shipments of grain originating at St. Joseph, Atchison, Leavenworth and other common points (which did not include Omaha or Council Bluffs) to Texarkana, Shreveport, and common points, in which the Kansas City Southern was to receive ten cents per hundred as its proportion of the joint rate. Afterward this rate was amended so that its proportion was fourteen cents, and by another amendment fourteen and one-half cents, per hundred.

The joint rate given to Forrester Brothers was not reported to the interstate commerce commission and published, as required by law, and therefore did not become an established legal rate. There is no direct proof that either road had a legally established and effective local rate, but there is some evidence as to a local rate from which it might be inferred that such a rate existed. This rate was six and one-half cents per hundred from Omaha to Kansas City, Mo., and ten cents from there to Texarkana.

After the case had been partially tried the jury were discharged, and the trial proceeded to the court. At the conclusion of the trial the court filed conclusions of law. No findings of fact were found or filed. The conclusions of law read:

"(1) Courts will never presume a contract to be illegal. Its illegality must be shown, and after a contract is once established the party who desires to relieve himself of the obligations of the contract must satisfy the court of the illegality of the contract.

"(2) The principles of the common law are operative upon all interstate commerce transactions, except in so far as they are modified by congressional enactment, and if a contract is valid at common law it is valid under the statutes, unless prohibited thereby, and it devolves on the garnishee in this case to establish such invalidity.

"(3) Joint through rates between different railroads are subjects of agreement between railroad companies, and can only be established by agreement between railroad companies, and neither under the common law nor under the statutes regulating interstate commerce are contracts for joint through rates prohibited, provided the through rate agreed upon is just and reasonable, and is not less than the local rates of one of the roads entering into such agreement.

"(4) The fact that the Kansas City Southern Railway had established joint through rates with companies other than the northern connecting lines did not prevent it from legally making a joint through rate with the northern connecting lines and accepting as its proportion of such joint through rate a less rate per hundred pounds, at the same time and for the same haul, than it received from other railroads as its proportion of the joint through rate made with them.

"(5) It is the duty of the railroad companies, and not the duty of the shipper, to see that joint through rates are filed with the interstate commission and published as required by law. Where two railroad companies have never gotten together and established a joint through rate over their lines or railroads, and have never filed a joint through rate with the interstate commerce commission or published such a rate, the making of such a rate is open to contract between such railroads, and when they make such rate, and the through rate agreed upon between them is just and reasonable and not less than one of the locals, and not unduly preferential, it is a lawful rate, and a shipper can take advantage of such rate and may make a valid contract with such railroad companies for the shipment of grain at such rate, and may compel each of the railroad companies to carry the grain for the proportional rate agreed upon between such railroads; and the mere failure of either or both of such railroad companies to file such rates with the interstate commerce commission and publish such rates as required by the interstate commerce laws does not deprive the shipper of such rate or invalidate the shipper's contracts with the railroad companies for such rate.

"(6) When a joint through rate is established between two or more railroad companies by the agreement of these companies, and the proportion of the

through haul is fixed by the agreement of the parties, the proportional rate thus established is the lawful rate, and can only be changed by complying with subdivision 'F,' section 6, of the interstate commerce law, which provides: 'No advance shall be made in joint rates, fares and charges shown upon joint tariffs, except after ten days' notice to the commission, which shall plainly state the changes proposed to be made in the schedule then in force and the time when the increased rates, fares or charges will go into effect. No reduction shall be made in joint rates, fares and charges, except after three days' notice, to be given to the commission as is above provided in the case of an advance of joint rates. The commission may make public such proposed advances, or such reductions, in such manner as may, in its judgment, be deemed practicable, and may prescribe from time to time the measure of publicity which common carriers shall give to the advances or reductions in joint tariffs.'

"(7) The contract between the northern connecting lines and the Kansas City Southern Railway Company, in which the Kansas City Southern Railway Company agreed to accept eight (8c) cents per one hundred pounds as its proportion of the joint through rate on corn and oats from Omaha, Neb., to Texarkana, Tex., and Shreveport, La., was a good and valid contract between the railroad companies and Forrester Brothers, and Forrester Brothers were entitled to have their grain hauled from Kansas City, Mo., over the Kansas City Southern Railway Company's railroad to Texarkana, Tex., and Shreveport, La., at the rate of eight cents (8c) per one hundred pounds. The Kansas City Southern Railway Company charged ten thousand five hundred twenty-seven and 55-100 dollars ($10,527.55) in excess of the lawful rate, and is indebted to Forrester Brothers in the sum of ten thousand five hundred twenty-seven and 55-100 dollars ($10,527.55), with interest at the rate of six (6%) per cent. per annum from the 7th day of March, 1902, and the plaintiff is entitled to a judgment against said garnishee for said amount, interest and costs.

"(8) The court declares the law to be that where two lines of railroad, under the operation of separate and independent companies, form a continuous line for

5—79 KAN.

interstate shipments, but the companies operating such railroads have never established a joint tariff of rates thereover, then the lawful rate for an interstate shipment passing over said railroads is the legally published tariff rate from the point of origin of the shipment to the point of connection with the second carrier, plus the legally published tariff rate of such second carrier from such point of connection to the point of destination of the shipment."

Conclusion No. 8 was requested by the railway company. It also requested the court to make the following conclusions of law, which request was denied:

"(1) The court declares the law to be that, inasmuch as the claim made by the plaintiff in this case is one arising under and controlled by the act of congress commonly known as the interstate commerce act, this court is without jurisdiction to determine this cause; and that, under the law, jurisdiction thereof is vested either with the federal courts or with the interstate commerce commission.

"(2) Where an interstate shipment of merchandise passes from the point of origin to the point of destination over the lines of two separate carriers, and such carriers have not, by agreement, established a joint rate over their said lines and filed and published the same in the manner required by the interstate commerce act, then the only lawful charge for transportation to be applied to such shipment is the published tariff rate of the first carrier from the point of origin of the shipment to the point of connection with the second carrier, plus the published tariff charge of the second carrier from the point of connection with the first carrier to the point of destination. And any contract which the shipper may make with either or both carriers for a rate less than the sum of the rates above mentioned is illegal and non-enforceable.

"(3) The court declares the law to be that even if Forrester Brothers, through their representative, made a contract with the northern connecting lines and the Kansas City Southern for a joint rate from Omaha to Texarkana, Shreveport and other southern points, which said contract price was less than the sum of the published rate of the northern connecting lines from

Railway Co. v. Albers.

Omaha and northern points to Kansas City, plus the legally published tariff rate of the Kansas City Southern Railway Company from Kansas City to the southern points above mentioned, neither said northern connecting lines nor the Kansas City Southern Railway Company could lawfully apply such contract rate to plaintiff's shipments until the same had been filed and published in the manner required by the interstate commerce act; and if such contract rate was never filed with the interstate commerce commission and published, as required by said act, or by said commission, then such contract rate never became a lawful rate, nor could the same be lawfully applied to Forrester Brothers's shipments described in the evidence in this case.

"(4)  The court declares the law to be that on interstate shipments of merchandise the only lawful rates applicable thereto are such rates as have been filed and published in the manner required by the interstate commerce act."

The court found in favor of the plaintiff, and assessed the amount of recovery for overcharges paid, with interest to the date of judgment, at $13,180.43.

After this rate had been made for Forrester Brothers a memorandum tariff sheet was made and distributed among the freight agents along the line of the roads interested.  By this memorandum it appeared that the rate made with Forrester Brothers would expire October 31, 1906.  Neither Forrester Brothers nor any one other than the railroad employees knew of the existence of such memorandum.  No steps were taken to publish it and to make it a legal rate.  The officers testified that it was made by the mistake of a clerk, and was not regarded as of any legal force.

·S. W. Moore, Cyrus Crane, and W. J. Watson, for plaintiff in error.

J. M. Wayde, and C. O. Pingry, for defendant in error.

The opinion of the court was delivered by

GRAVES, J.: The argument in this case covers a wide range of subjects connected with the interstate commerce law, and both sides of the controversy have been clearly and ably presented. The facts of the case, however, as they come here, may eliminate some of the questions discussed. The trial court not having filed conclusions of fact, we will be compelled, under the long-established rule of this court, to assume that it found every fact necessary to support the judgment rendered to be established by the evidence, if there is any testimony in the record tending to sustain such facts. (*Mushrush v. Zarker,* 48 Kan. 382, 29 Pac. 681; *Blanchard v. Jackson,* 55 Kan. 239, 37 Pac. 986; *Thompson v. Pfeiffer,* 60 Kan. 409, 59 Pac. 763; *Taylor v. Herron,* 72 Kan. 652, 82 Pac. 1104.)

The first point presented by the plaintiff in error is that the action, though prosecuted apparently for the recovery of overcharges, is in reality one to recover rebates. It is argued that the Kansas City Southern railway hauled the grain for Forrester Brothers as alleged, and collected the lawful rate therefor, and this action was instituted to recover a part of that rate under the plea that the company agreed to take less than the established rate. Of course, if this claim were sustained by the evidence this action would be at an end. The district court, however, did not take this view of the testimony, and we are unable to find any substantial support for this position in the facts presented by the record. The evidence abundantly sustains the claim of the plaintiff that a contract was made for the carriage of grain for Forrester Brothers, as claimed, to wit, for a joint rate of sixteen and one-half cents, of which the Kansas City Southern agreed to accept eight cents per hundred as its proportion of the rate. This contract is established by the officers who made it. There is no controversy in the evidence upon

this question. The trial court would not have been justified in finding otherwise.

The railway company insists that this rate is unlawful and void, for these reasons: First, that it was not filed with the interstate commerce commission and published, as required by the interstate commerce law, and, second, that it was in conflict with other rates which were legally established and existing at that time. It is further claimed that the Kansas City Southern had an established local rate between Kansas City, Mo., and the points of destination mentioned in the Forrester rate of ten cents per hundred, and, as there was no established joint rate, one could not be made by contract for less than the sum of the two locals. As applied here, this contention means that at the time when the Forrester rate was agreed to each of the roads interested in that rate had a duly established local rate over their lines between Omaha and common points and Kansas City, and between Kansas City and Texarkana and common points; that, as these roads had no legally established joint rate, they could not make one for less than the sum of the two locals, for the reason that such joint rate would conflict with a rate lawfully established under the interstate commerce law, which would be unlawful. It is conceded that these roads could have established a joint rate at any reasonable amount, and without reference to local rates, by taking the required legal steps for that purpose. It is also claimed that the Kansas City Southern railway had a legally established joint rate in connection with other lines between St. Joseph, Atchison, Leavenworth, and common points, through Kansas City, to Texarkana and common points, and its proportion of such joint rate was ten cents a hundred, and that this rate was the legally established rate which applied to all freight shipped south over the Kansas City Southern for which there was no legal rate beyond Kansas City, and therefore the Forrester Brothers grain had to be taken under

this rate. For these various reasons it is insisted that the eight-cent rate made for Forrester Brothers was unlawful and void, and that the rate collected was the valid rate at the time.

We can not concur in this conclusion. The facts in the record, taken in connection with the judgment of the trial court, will not sustain this position. The contention that each of the roads making the Forrester rate had a legally established local rate is not sustained by the evidence. No such proof was offered. There was some talk by the witnesses of a local rate, and what it was on each road, but no proof that such rate had been established under the law was presented. The contract as alleged by the plaintiff having been clearly established, the burden was upon the railway company to show by way of defense that such contract was for some reason unlawful. If the invalidity resulted from the existence of legally established rates with which the rate relied upon by the plaintiff was in conflict, it was incumbent upon the railway company to allege and prove such fact. (*Railway Co. v. Relf*, 78 Kan. 463, 97 Pac. 477; *Railroad v. Horne*, 106 Tenn. 73, 59 S. W. 134; *Southern Pacific Co. v. Redding & Son*, 17 Tex. Civ. App. 440, 43 S. W. 1061; *Southern Kansas Ry. Co. of Texas v. J. W. Burgess Co.*, [Tex. Civ. App. 1905] 90 S. W. 189.) This was not done. In the absence of such proof we are compelled to hold, as the trial court evidently did, that there were no legally established local rates which were in conflict with the rate made for Forrester Brothers or which would in any manner affect the validity of the last-named rate. The joint rate made by the Kansas City Southern in connection with connecting roads other than the northern connecting lines, to the making of which the lines last named and Forrester Brothers were not parties, and to which they did not consent, could not affect the joint rate previously made for Forrester Brothers. A joint rate is only binding upon the lines which agree to it and ship-

Railway Co. v. Albers.

pers who ship under it. We think the existence of this rate does not affect any of the questions presented here. It appears that Forrester Brothers, relying upon their contract, purchased large quantities of grain and shipped it over these contracting lines. It does not seem reasonable, therefore, that one of such lines could nullify the rate agreed upon merely by agreeing with other parties for a different rate, where the shipment is between different points and over different roads.

Forrester Brothers were satisfied with the rate which they made and relied upon, and do not wish to exchange it for one made by other parties, in their absence, without their knowledge, and to which they have not consented; and we are unable to see any good reason why they should be compelled to accept such a rate. There being no rate established under the law, a rate by contract was proper and lawful. (*Wabash Ry. Co. v. Sloop*, 200 Mo. 198, 98 S. W. 607; *Carlisle v. Missouri Pacific Ry. Co.*, 168 Mo. 652, 68 S. W. 898.)

Upon the point that the rate agreed to was void because it was not established under the law, several decisions have been cited holding that rates made for a less amount than the established rate are unlawful and the shipper will be held to pay the established schedule rate notwithstanding his contract, even when he is innocent and ignorant of the established rate. These cases do not apply here, however, for the reason that in this case there was no established rate. This was the first joint rate ever made between these roads. No local rate had been established by either road on the route covered by this rate.

It will also be noted that this rate was made in September, 1901, and shipment began thereunder immediately. The steps necessary to the legal establishment of such rate must of necessity have been taken thereafter. This the shipper could not do. We conclude, therefore, that at the time the joint rate was made for Forrester Brothers it was not in conflict with any established rate which in any manner affected its validity.

It appears that the representative of Forrester Brothers acted in good faith, and had no knowledge that the rate agreed upon was not a valid rate established in accordance with the interstate commerce law. The fact that the rate agreed upon was not regularly established was not the fault of the shipper. It was a matter over which he had no control. It was the duty of the carrier to comply with this requirement of the law. Its laches in this respect can not be used by it to avoid the just consequences of its contract. The rate agreed to was fair and reasonable, being equal to the sum of what was then known as the two locals. Under the contract the Kansas City Southern was entitled to the proportion of the whole rate that was satisfactory to it when the rate was made, and it is not now in a position to complain.

While it is true that no definite agreement was made as to the quantity of grain which Forrester Brothers might ship under this rate, nor as to how long the rate should continue, yet, considering the whole evidence, it is apparent that the entire shipment was contemplated by both parties. Very soon after the rate was agreed upon the representative of Forrester Brothers notified the companies that they wanted 500 cars. They were told that while such a large number could not be furnished at once they would be supplied as rapidly as possible. Cars were furnished from time to time, and shipments made to the extent of over 400 cars. No notice was given to Forrester Brothers that the rate had expired, but on the contrary, when demand was made by them that the overcharges paid be returned, promises were made that an adjustment of the matter would be made. Under this evidence the trial court would be justified in finding, as it evidently did, that the rate covered the entire shipment.

It is argued that the district court did not have jurisdiction of this case, for the reason that the interstate commerce act gives exclusive jurisdiction to the federal courts in actions to recover overcharges made in viola-

tion of that act. This action, however, is not one to recover overcharges paid in violation of that act. The overcharges sought to be recovered here consist of payments made in excess of the proper charges stipulated in a contract of shipment to which the provisions of that act have no application, and, therefore, the question of jurisdiction does not arise. (*Carlisle v. Missouri Pacific Ry. Co.*, 168 Mo. 652, 68 S. W. 898; *Wabash Ry. Co. v. Sloop*, 200 Mo. 198, 98 S. W. 607.)

Finally it is contended that the overcharges were paid voluntarily, and therefore can not be recovered. The payments were made by the financial agent of Forrester Brothers at Kansas City, who did not know what rate had been agreed upon, but assuming the bills presented were in accordance with the contract made payment without objection or question. The bills thus paid were forwarded to Forrester Brothers, who did not notice the fact of overpayment for some time. When it was brought to their attention they took the matter up with the general freight officers of the railroads, and under promise that the matter would be adjusted the question was postponed from time to time. The courts have quite generally refused to apply the ordinary rule of voluntary payment to cases of this kind. In the case of *The Louisville, Evansville and St. Louis, etc., Railroad Co. v. Wilson et al.*, 132 Ind. 517, 32 N. E. 311, 18 L. R. A. 105, the supreme court of Indiana said:

"We are of the opinion, however, that the decided weight of authority is that the payment of an overcharge of freight to a railroad company engaged as the common carrier of goods is not a voluntary payment within the ordinary meaning of that term." (Page 521.)

In the case of *Heiserman et al. v. The Burlington, Cedar Rapids & Northern Railway Co.*, 63 Iowa, 732, 18 N. W. 903, it was said:

"Those who do business with railroads never come in contact with the officers who possess authority to

fix or abate rates of charges; indeed, they usually hardly know their names or where to find them. . . . These considerations take the case from the operation of the familiar rule which forbids recovery on account of payments voluntarily made without objection or protest." (Page 737.)

In the case of *Mobile & Montgomery Railway Co. v. Steiner, McGehee & Co.,* 61 Ala. 559, it was said:

"The nature of the business considered, the shipper does not stand on equal terms with the carrier in contracting for charges for transportation; and if the shipper pays the rates established in violation of law by the carrier, rather than forego his services, such payment is not voluntary, in the legal sense, and the shipper may maintain his action for money had and received, to recover back the illegal charge." (Syllabus.)

In *The Louisville, Evansville and St. Louis, etc., Railroad Co. v. Wilson et al.,* 132 Ind. 517, 18 L. R. A. 105, it was said:

"Indeed there seems to be but little conflict in the authorities in this country holding that the payment to a railroad company engaged in the business of common carrier of an overcharge of freight for goods transported over the road of such company is not a voluntary payment, as the law interprets that term." (Page 522.)

This rule seems to be placed upon the ground that the parties do not stand upon equal grounds, and an objection or protest would be unavailing. In the case last cited a large number of cases are cited to the same effect. We think that under the facts of this case the payment should not be held to be voluntary so as to bar a recovery, even under the ordinary rule, and certainly not under the rule stated in the above cases.

We have been unable to find any error in the action of the trial court. We concur in the controlling questions of law declared by it, and think it fairly interpreted the evidence. The judgment is therefore affirmed.

OPINION DENYING A PETITION FOR A REHEARING.

No. 15,627.

The opinion of the court was delivered by

GRAVES, J.: A petition for a rehearing has been filed in this case, calling attention to a misstatement of fact in the opinion. The misstatement consists of a misuse of terms in describing the rates in force on the Kansas City Southern road when the rate with Forrester Brothers was made. The rate which the Kansas City Southern road had from Kansas City south to Texarkana and other points, in connection with the lines from Atchison, St. Joseph, Leavenworth, and other common points, was a proportional rate, instead of a joint rate, as stated in the opinion. The difference between these rates is quite material to that road, from its theory of the case. This proportional rate was regularly established under the provisions of the interstate commerce law, and if it was applicable to the shipments made by Forrester Brothers then no overcharges were made and no recovery should have been had by them. We do not think this rate, by whatever name designated, had any application to the Forrester Brothers shipment.

It is claimed that a proportional rate applies to all freight shipped between points where it exists, unless some other established rate applies. As applied to the Forrester Brothers shipment, it is claimed that the freight came to the Kansas City Southern road at Kansas City, and was reshipped from there to Texarkana or other points, the same as shipments originating at that point; and the rule as to the rates to be applied was the same as that which controlled in all other shipments from that point. We do not concur in this view. A proportional rate may apply to all freight which is not being carried under some other legal rate; but, if it does, the rule has no application here. As stated in the opinion, Forrester Brothers made a contract for a

joint through rate from Omaha, through Kansas City, to Texarkana. It was further agreed that shipments should be "billed through," and for a time they were so billed. We do not understand that a proportional rate like the one in question would interfere with the making of a joint through rate such as was made with Forrester Brothers. No such contention is made. It is simply insisted that the reshipment at Kansas City placed the freight under the same rule as to rates that would apply if an actual *bona fide* reshipment had been made.

All of the shipments made by Forrester Brothers were through shipments from Omaha to Texarkana, and should have been "billed through." This was the contract, and no mere colorable reshipment at Kansas City, by issuing new bills, could modify or avoid it. With this explanation we are satisfied with the opinion.

The petition for a rehearing is denied.