WICHITA FALLS & W. RY. CO. OF TEXAS et al. v. ASHER. (No. 532.)

(Court of Civil Appeals of Texas. Amarillo. Oct. 28, 1914. On Motion for Rehearing, Jan. 2, 1915.)

1. COMMERCE (§ 33*) — "INTERSTATE COMMERCE."

A shipment of goods which traverses another state, though the points of origin and destination are in the same state, is interstate commerce.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. §§ 26, 81; Dec. Dig. § 33.*

For other definitions, see Words and Phrases, First and Second Series, Interstate Commerce.]

2. CARRIERS (§ 91*)—CARRIAGE OF GOODS—RATES—ERRONEOUS QUOTATION.

A wrong quotation by a railway agent as to the freight rate to be charged on an interstate shipment gives no right of action to the shipper for injuries on account of the misquoted rate, though the tariff is not posted at the carrier's local station.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 338–355; Dec. Dig. § 91.*]

3. TRIAL (§ 105*)—RECEPTION OF EVIDENCE—ADMISSION WITHOUT OBJECTION.

The uncontradicted testimony of a railway freight agent, admitted without objection, that certain rates were in effect on the day of a shipment, though subject to objection as a conclusion, is sufficient proof of that fact.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 260–266; Dec. Dig. § 105.*]

4. CARRIERS (§ 104*)—CARRIAGE OF GOODS—ACTION FOR DETENTION—ADMISSIBILITY OF EVIDENCE.

In an action against carriers for the detention of goods until the owner paid the lawful rate thereon, which was more than the rate quoted by the agent at the time of the shipment, testimony by plaintiff that he did not have enough money to pay the additional charges, and knew no one from whom he could borrow it, was immaterial, since the law requires a carrier to collect and a shipper to pay the legal rate.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 439–447, 459–461; Dec. Dig. § 104.*]

5. APPEAL AND ERROR (§ 1050*)—PREJUDICIAL ERROR—ADMISSION OF EVIDENCE.

The admission of such testimony was prejudicial under Court of Civil Appeals rule 62a (149 S. W. x), forbidding reversals unless the error probably caused an improper judgment, where the jury awarded plaintiff $300 damages for the detention of the goods for 100 days.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 1068, 1069, 4153–4157, 4166; Dec. Dig. § 1050.*]

6. CARRIERS (§ 177*)—CARRIAGE OF GOODS—LIABILITY—CONNECTING CARRIERS.

Where goods are shipped over the lines of connecting carriers, the common-law liability of each is limited to damages accruing on its own line, but any one of them may, by special contract, make itself liable for the entire carriage.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 775–789, 791–803; Dec. Dig. § 177.*]

7. CARRIERS (§ 187*)—CARRIAGE OF GOODS—LIABILITY—QUESTION FOR JURY.

Where a shipper claimed a contract by an initial carrier, rendering it liable for the entire carriage, it was a question for the jury whether the oral negotiations between the shipper and the carrier's agent amounted to such a contract.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 851, 852; Dec. Dig. § 187.*]

8. CARRIERS (§ 177*)—CARRIAGE OF GOODS—LIABILITY—CARMACK AMENDMENT.

The Carmack amendment (Act June 29, 1906, c. 3591, § 7, 34 Stat. 593 [U. S. Comp. St. 1913, § 8592]) to Interstate Commerce Act Feb. 4, 1887, c. 104, § 20, 24 Stat. 386, requiring every common carrier receiving property for transportation from a point in one state to a point in another state to give a bill of lading therefor, and making it liable for all damages to the goods caused by it or any connecting carrier, when strictly construed as a penal law, does not apply to a shipment through another state to a point in the same state as the point of origin, though the evil is the same in such a case as in the cases covered by the express terms of the amendment.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 775–789, 791–803; Dec. Dig. § 177.*]

9. CARRIERS (§ 139*)—LIABILITY AS WAREHOUSEMAN—REFUSAL TO PAY CHARGES.

Where the agent of an initial carrier quoted an incorrect rate to a shipper, and the latter refused to pay the legal rate, the liability of the carrier for the safe-keeping of the goods thereafter would be as warehouseman and not as common carrier.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 617–619; Dec. Dig. § 139.*]

On Motion for Rehearing.

10. CARRIERS (§ 189*)—CARRIAGE OF GOODS—RATES—PUBLISHED TARIFF.

The filed and published freight rates for an interstate shipment, whatever they may be, are conclusive as to the rate to be charged.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 162, 854, 855, 859–865; Dec. Dig. § 189.*]

11. CARRIERS (§ 193*)—CARRIAGE OF GOODS—RATES—PUBLISHED TARIFF.

Where published tariffs, establishing the rates for shipments between certain places, excepted therefrom the lines of a certain carrier which had not subscribed to the tariffs, in determining the rate on an interstate shipment originating on the lines of that carrier the tariff might be used to determine the rate on the other lines, which, in combination with the local rate of the initial carrier, would make the through rate.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 348, 868–869; Dec. Dig. § 193.*]

Appeal from District Court, Collingsworth County; J. A. Nabers, Judge.

Action by J. C. Asher against the Wichita Falls & Wellington Railway Company of Texas and others. Judgment for plaintiff, and defendants appeal. Reversed and remanded, and motion for rehearing overruled.

Charles C. Huff, of Dallas, and R. H. Templeton, of Wellington, for appellants. J. L. Lackey, of Wellington, and Presler & Thorne, of Memphis, for appellee.

HENDRICKS, J. The appellee, plaintiff in the court below, sued the Wichita Falls & Wellington Railway Company of Texas and the Wichita Valley Railway Company for alleged damages to an "emigrant" shipment from Spur, Tex., to Wellington, Tex., claiming that he consummated an oral contract with the agent of the Wichita Valley Railway Company at Spur, Tex., for the shipment of said "emigrant" car at the agreed freight rate of $50 for the through transportation, and that when said shipment reached Wellington, the destination, the Wichita Falls & Wellington Railway Company of Texas refused to surrender the same to him unless $46 additional freight was paid. This shipment was required to go through a portion of the state of Oklahoma and return into the state of Texas in order to reach Wellington, the destination, and the appellants pleaded specially that the transportation was interstate on this account, and further that the correct and legal rate on the shipment was $96 instead of $50, and that the defendant the Wichita Falls & Wellington Railway Company of Texas was justified in refusing to deliver the shipment to the appellee until the correct freight was paid, and that there could be no recovery of damages for the detention of said shipment. The appellee also claimed damages on account of alleged rough handling and alleged negligent storing of said shipment, and the jury returned a verdict in his favor for $200 for such alleged damages and for $300 on account of the detention of the shipment.

The appellants assign error that the verdict of the jury, assessing the $300 as damages for detention of the shipment, is erroneous in that the evidence is uncontradicted that the rate of $96, which the carrier demanded at destination, was the legal rate on file with the Interstate Commerce Commission, and was the only rate that could be assessed and collected by the appellants as charges for the transportation; and that until the rate was tendered or paid the appellee was unable to recover upon this issue. The appellants' special plea that the shipment was interstate is proven in the record; the shipment originating at Spur, Tex., on a branch of the Wichita Valley and moving thence to Stamford, thence over the main line of the Wichita Valley to Wichita Falls over the line of the Wichita Falls & Northwestern Railway Company of Texas to Red river, thence through Oklahoma over the same system, returning into Texas, and thence over the Wichita Falls & Wellington Railway Company of Texas from the state line to said Wellington, the place of destination.

The appellants contend that by Supplement 24 of Texas Lines Basing Tariff No. 2, issued by the Interstate Commerce Commission, on its face purporting to be effective November 25, 1911, and claimed to have been in effect at the time this shipment was made, the rates between Wellington, Tex., and all Texas points included in this territory, as applied to the Wichita Falls & Northwestern Railway Company, were the same on all classes and commodities, including this character of shipment (excepting lumber and other products not necessary to mention), as then applied between Shamrock, Tex., on the Chicago, Rock Island & Gulf Railway Company, and such Texas points as shown in said tariff, further asserting, however, that the origin of the shipment being upon the Wichita Valley, and that this basis of rates in this territory, by an exception, not applying in connection with the Wichita Valley Railway Company, and certain other roads not necessary to mention, hence a through joint rate, on account of the Wichita Valley having been excepted therefrom, could not be applied by that road, in routing this character of shipment from Spur to Wellington, by using Shamrock as a basing point; hence some other rate necessarily would have to control this shipment, and we add if legally in existence.

Although this through joint rate was not applicable on account of the Wichita Valley, upon which Spur is located, having been excepted from the same, the further reasoning is that the rate from Wichita Falls to Wellington on this character of shipment, as shown by the supplement indicated above, was the same as the rate, whatever it may be, would have been from Shamrock to Wichita Falls, and that, if the rate from Wichita Falls to Wellington is the same as the rate from Shamrock to Wichita Falls—the record again shows that the entire line of the Chicago, Rock Island & Gulf Railway Company, on which Shamrock is located, is situated in what is known as differential territory—that the maximum rate from Shamrock to Wichita Falls is 23 cents per hundredweight, as applicable to this character of shipment, and the record further shows that as to a shipment for the distance between Shamrock and Wichita Falls, by applying a differential basis, there should be added a differential of two cents per hundredweight, making an aggregate rate of 25 cents per hundredweight as the rate from Wichita Falls to Shamrock, and that likewise this would be the same rate from Wellington to Wichita Falls, and from Wichita Falls to Wellington, if the shipment had been made exclusively between those points upon the system of Wichita Falls & Northwestern.

As to the rate applicable to this character of shipment between Spur, Tex., and Wichita Falls, Tex., on the Wichita Valley System, it is shown by Texas Basing Tariff No. 2, issued

by the Interstate Commerce Commission, that (quoting from the circular):

"On shipments between points on Wichita Valley Railway line north of Stamford and points on the Wichita Valley and points on Ft. Worth & Denver City Railway, and all other lines, rate to apply, two-line rate."

Spur, Tex., is located north of Stamford, on the line of the Wichita Valley Railway, and including the branch from Spur to Stamford and from Stamford to Wichita Falls, over the main line of the Wichita Valley, make the two-line rate, also shown by the tariff and issued by the Commission; and as it is shown that the shipment comes under the heading of class D, as evidenced by "Texas Line Classification No. 2, Interstate Commerce Commission Tariff No. 11, and that rates for 196 miles and over 192 miles, class D, will be 23 cents per hundredweight," this constitutes the two-line rate applicable to this class of shipment from Spur to Wichita Falls.

[1] It is settled law that transportation, where traversing another state, or a portion of same, though the points of origin and destination are in the same state constitutes interstate commerce. Hanley v. Railway Co., 187 U. S. 617, 23 Sup. Ct. 214, 47 L. Ed. 333.

[2] It is also settled that a wrong quotation, by a railway agent as to the freight rate applicable to an interstate shipment, of a lower rate than that fixed by the published tariff, gives no right of action to a shipper who claims to have sustained injury on account of the misquoted rate. Gulf, Colorado & Santa Fé Railway Co. v. Hefley, 158 U. S. 98, 15 Sup. Ct. 802, 39 L. Ed. 910; Railway Co. v. Mugg, 202 U. S. 242, 26 Sup. Ct. 628, 50 L. Ed. 1011. And this is the rule though the tariff is not posted in the carrier's local station. Ill. Cent. Ry. v. Henderson Elevator Co., 226 U. S. 441, 33 Sup. Ct. 176, 57 L. Ed. 270; Kansas City Southern Railway Co. v. Albers Com. Co., 223 U. S. 573, 32 Sup. Ct. 316, 56 L. Ed. 556.

The case of Railway Co. v. Albers Commission Co., supra, was one where grain merchants, Forrester Bros., contracted with the railway company to transport a large quantity of grain from Omaha, Neb., to Texarkana, Tex., through Kansas City, Mo., at a stipulated rate; the Commission Company as their judgment creditor garnishing the railway company on the theory that the railway company owed the judgment debtor overcharges in freight above the agreed rate. The Supreme Court of Kansas (79 Kan. 70, 99 Pac. 824), originally deciding the case, said:

"The contract as alleged by the plaintiff having been clearly established, the burden was upon the defendant to show, by way of defense that such contract was for some reason unlawful. If the invalidity resulted from the existence of legally established rates with which the rate relied upon by the plaintiff was in conflict, it was incumbent upon the defendant to allege and prove such fact."

The court had previously said:

"The contention that each of the roads making the Forrester rate had a legally established local rate is not sustained by the evidence. No such proof was offered. There was some talk by the witnesses of a local rate, and what it was on each road, but no proof that such rate had been established under the law was presented."

The Supreme Court of the United States thought that either one of two rates was established different from the agreed rate, though better testimony might have been preferable, and as to the controlling rate said:

"As it was conceded that there was no established joint through rate, it likewise is a necessary conclusion that the shipments, even if moving on through bills of lading, should have taken these local rates unless the latter was superseded or displaced by the special agreement."

And, quoting from Justice Hook of the Eighth Circuit Court of Appeals, the Supreme Court of the United States further said:

"If an initial carrier accepts traffic for transportation and issues its bill of lading over a route made up of connecting roads, for which no joint through rate has been published and filed with the Commission, the lawful rate to be charged is the sum of the established local rates published and filed by the individual roads; or if, as was the case here, there is a local rate over one road and a joint rate over the others for the remainder of the route, all published and filed with the Commission, the lawful through rate to be charged is the sum of the local and joint rates. By failing to establish or concur in a joint through rate for traffic accepted for interstate transportation, each participating carrier impliedly asserts that the rate which it has duly established, published, and filed for its own line shall be a component part of the through rate to be charged. It is competent for carriers, if conditions justify it, to make their proportions of a through rate less than the local charges upon their own lines, but in doing so they should observe legal methods, and, if no action to that end is taken, they in effect adhere to the rates established, published, and filed by them as applying, not only to local, but to through, traffic."

The Circuit Court of Appeals, in the case of Chicago, B. & Q. Ry. Co. v. U. S., 157 Fed. 833, 85 C. C. A. 197 (from which the Supreme Court's quotation was made), in extending the reasoning as applicable to this question, further used the following language:

"The initial carrier which receives traffic and issues a bill of lading to ultimate destination should be held to have done so in view of the only rates which its connections are authorized by law to charge. This principle was recognized by the Commission as early as March 23, 1889 (2 Interst. Com. Com'n R. 656), when it said: 'When no other tariff is filed, the rates on traffic carried over or upon more than one line will be the sum of the local rates of the individual roads, or of local and joint rates, as the case may be.'"

Again the court said:

"By routing and billing the traffic over the connecting lines, the initial carrier adopts and is bound by their lawful rates."

The appellants also offered in evidence rule 5, issued and promulgated by the Interstate Commerce Commission, as follows:

"Rates on Through Shipments When No Joint Rates Apply.— (a) The practice on the part of carriers of accepting and transporting through shipments, as to which no joint rate applies, upon rates made up by combination of rates of the several carriers participating in the movement, and of collecting, as delivering carriers, the aggregate charges of the several carriers for their portions of such charges, is practically universal. That custom has the same binding effect as a joint rate, both as between carriers themselves and as between carriers and shippers. Therefore carriers may construct rates for through shipments to and from points to and from which there is no applicable published joint rate, by using lawfully published and filed basis, locals or proportionals, in connection with other lawfully published and filed tariffs."

[3] The witness Fontaine, who was the general freight agent of the delivering line, testified, without contradiction, that these rates were in effect on the 3d day of January, 1912, when the shipment was made. Believing that it is the law that a carrier shall place in the hands and custody of its agent, at every station, warehouse, or office at which passengers or freight are received for transportation, schedules of all rates and fares applying from the station, as held by the Supreme Court of North Carolina in the case of Virginia-Carolina Peanut Co. v. Atlantic Coast Line Railway Co., 82 S. E. 1, and that compliance with the Interstate Commerce Act in that respect is made a condition precedent to the effectiveness of the schedules and the lawfulness of the rate charged thereunder (same case, supra), however, is the conclusion of the witness in this case that these rates were in effect at the time the shipment moved sufficient proof of that fact? We presume, if this testimony had been objected to as a conclusion of the witness, such objection would have been sustained, and as the Supreme Court of the United States said in the Albers Commission Co. Case, supra, in passing upon a similar question:

"This testimony was not the best evidence, but, being offered and admitted without objection, it was evidence which could not be disregarded."

Under rule 5, introduced by appellants, permitting carriers, where there is no applicable published joint rate, to construct rates "by using lawfully published and filed basis, locals or proportionals, in connection with other lawfully published and filed tariffs," we think the two-line rate from Spur to Wichita Falls could have been used "in connection with other lawfully published and filed tariffs," or "basis," which was the rate from Wichita Falls to Wellington, based upon the rate from Shamrock to Wichita Falls, for the purpose of ascertaining the through rate made up by the combination, and that this case comes within the spirit of the Albers Commission Co. Case and the case of Chicago, B. & Q. Railway Co. v. United States, and

that an "initial carrier, which receives traffic and issues a bill of lading to ultimate destination, should be held to have done so in view of the only rates which its connections are authorized by law to charge," which in this instance, in connection with the two-line rate, the only rate which the Wichita Falls & Wellington Railway Company of Texas could charge from Wichita Falls to Wellington, is the rate from Shamrock to Wichita Falls. We sustain the main assignment of appellants complaining of the $300 verdict as damages for detention of the freight; however, it may still remain a jury question whether the rate is a legal rate, and existent as such, at the time the shipment was made.

[4] Appellants' third assignment of error complains of the testimony of the appellee, Asher, to the effect that, when the railway company refused to deliver his car of goods until he paid $46 more freight, he did not have the money necessary to pay the amount demanded by the agent as additional freight, and that he did not know of any one in the town of Wellington from whom to borrow the money, and that he was a stranger in that community; appellants objecting that said testimony was "immaterial, prejudicial, and was flaunting the poverty of the plaintiff before the jury," etc. Under the law, the shipper, as well as the carrier, is arbitrarily bound by the established legal rate, the carrier, for the purpose of preventing discrimination, is required to demand such rate, and the shipper is required to pay the same in order to obtain the goods; otherwise the lien of the carrier as security for the freight, as provided by the Interstate Commerce Act, is in existence. The carrier retained the goods for 101 days when the appellee sequestered the property at the time of the institution of this suit. As stated, the jury awarded $300 damages for detention and $200 damages to the goods.

[5] The answer of appellee to this assignment is in effect that the testimony related to an immaterial matter, and that the court should apply rule 62a (149 S. W. x). We are unable to find a case similar in nature, but believe that the application of the principle in a different character of cases, arguing the inadmissibility of this character of testimony, is proper. For example: In the case of M., K. & T. Railway Co. v. Hannig, 91 Tex. 349, 43 S. W. 509, the appellee, suing for damages on account of personal injuries, was permitted to testify that he was a married man, and that his wife had no means of support, except her own labor. The Supreme Court said:

"The evidence in question in this case threw no light upon any issue properly involved in it, and was calculated solely to awaken the sympathy of the jury, and thereby to swell the damages to be awarded by the verdict. Counsel for the plaintiff evidently thought it would have some effect in plaintiff's favor, else he would

not have insisted upon its admission over the objection urged on part of the defendant."

In the case of Gulf, Colorado & Santa Fé Railway Co. v. Johnson, 99 Tex. 337, 90 S. W. 164, the mother of an injured minor was suing to recover for the diminution to her in value of her son's services, and for such expenses as may have been rendered necessary by the injury. In this case the appellee is also suing for the difference in value of his property. The Supreme Court said in the case cited, The mother's "poverty did not tend to show" the damages, reversing the case on account of the prejudicial testimony. Of course the difficulty of rule 62a is in its application. We are inclined to think, however, that where practically $100 a month for detention of the household goods in question was awarded by the jury and $200 damages to the goods is also given, as applied to this particular case, it is sufficient to say that the testimony is more consistent with affirmative injury than harmlessness.

The appellants in this case, by several assignments of error, are insisting on their written contract containing stipulations limiting the liability of the carrier on each line. The record shows that, upon inquiry by the appellee, the agent of the Wichita Valley Railway Company quoted the $50 rate from Spur to Wellington. Appellee's son executed the contract of shipment, accompanying the same in the transportation, the contracts containing the usual stipulations limiting the liability of the carrier to damages upon the line of each; the appellee contending, however, that his son had no authority to vary the consummated oral contract previously made with him by the agent. The court submitted the common-law liability of the carrier, as we construe the charge, for damages on account of rough handling, a leaky car, and improper storage of the goods, as well as loss of some of the goods, irrespective of negligence.

In the sixth paragraph of its charge he submitted the issue of the detention of the goods, based upon an oral contract, thereafter informing the jury that, if the oral contract was superseded by a written agreement, the plaintiff could not recover damages for the detention of the goods, also informing them, if there was no valid oral contract prior to the execution of the written contract, to likewise find for the railway companies on said issue.

[6] The Supreme Court of the United States has said in Michigan Cent. Ry. Co. v. Myrick, 107 U. S. 102, 1 Sup. Ct. 425, 27 L. Ed. 325, referable to an interstate shipment, that:

"The general doctrine * * * as to transportation by connecting lines, approved by this court, and also by a majority of the state courts, amounts to this: That each road, confining itself to its common-law liability, is only bound, in the absence of a special contract, to safely carry over its own route and safely to deliver to the next connecting carrier, but that any one of the companies may agree that over the whole route its liability shall extend. In the absence of a special agreement to that effect, such liability will not attach, and the agreement will not be inferred from doubtful expressions or loose language, but only from clear and satisfactory evidence."

In this case the agent quoted a rate, it is true, over the whole route, which was an erroneous one.

[7] Of course it is a jury question, eliminating the written contract entirely, whether the oral negotiations in this case amounted to a contract—an engagement upon the part of the actual carrier to carry entirely through to destination. If so, the initial carrier is liable for all the damages. Otherwise, if the contract was not to assume the through transportation, each carrier, when it comes to an interstate shipment, is only liable for the damages upon its own line. In the Myrick Case, supra, the Supreme Court of the United States also said:

"What constitutes a contract of carriage is not a question of local law, upon which the decision of a state court must control. It is a matter of general law, upon which this court will exercise its own judgment."

[8] The appellants complain considerably of the court's main charge to the jury, wherein he informed the jury that if the carriers roughly handled the goods, furnished a leaky car, or improperly stored the same, to find a verdict against both carriers. Of course we could assume from the jury's verdict that they found an oral contract, but whether the agent contracted for a through shipment, which has to be done, by special agreement, was a question not submitted to the jury. We do not mean to say that we would reverse the case on this proposition, but suggest it in view of another trial.

Appellees, though predicating their suit upon an oral contract, are insisting upon the application of the Carmack amendment as invalidating the stipulation for limited liability.

"The indisputable effect of the Carmack amendment is to hold the initial carrier engaged in Interstate Commerce and 'receiving property for transportation from a point in one state to a point in another state,' as having contracted for through carriage to the point of destination, using the lines of the connecting carriers as its agents." Atlantic Railway Co. v. Riverside Mills, 219 U. S. 186, 31 Sup. Ct. 164, 55 L. Ed. 167.

The purpose and object and the subject-matter of the act being applicable to through shipments, we are unable to read into the act that where a shipment originates and the point of destination is within the same state, that because it passes through a point in a foreign state in order to return to the state of origin, such would be transportation from a point in one state to a point in another state. It may be that the same reason inducing the act is also applicable to an interstate shipment, where the origin and destination are in the same state, as where the origin and destination of the shipment are in different states; and it is true that the numerous de-

cisions of the Supreme Court of the United States consider the evil intended to be remedied by the act; however, that court, in the case of Denn v. Reid, 10 Pet. 527, 9 L. Ed. 520, as early as 1836, in considering the construction of statutes for the suppression of evils and the advancement of remedies, said:

" * * * Cases may be found where courts have construed a statute most liberally to effectuate the remedy; but, where the language of the act is explicit, there is great danger, in departing from the words used, to give an effect to the law which may be supposed to have been designed by the Legislature. * * * It is not for the court to say, where the language of the statute is clear, that it shall be so construed as to embrace cases, because no good reason can be assigned why they were excluded from its provisions."

This act also is a penal one, if we interpret the law correctly. The Supreme Court of the United States, in the case of Adams Express Co. v. Croninger, 226 U. S. 504, 33 Sup. Ct. 151 (57 L. Ed. 314, 44 L. R. A. [N. S.] 257), said that one of the dominating features of the amendment was that:

"It affirmatively requires the initial carrier to issue 'a receipt or bill of lading therefor,' when it receives 'property for transportation from a point in one state to a point in another.' "

By another amendment (Act June 18, 1910, c. 309, § 10, 36 Stat. 549 [U. S. Comp. St. 1913, § 8574]), Congress has said:

"That any common carrier subject to the provisions of this act, or, whenever such common carrier is a corporation, any director or officer thereof, * * * or agent, or person acting for or employed by such corporation, * * * shall willfully suffer * * * omit or fail to do any act, matter, or thing in this act required to be done, * * * shall be deemed guilty of a misdemeanor," etc.

We take it that this act is penal as well as remedial, and while the Supreme Court of the United States, of course, has often pursued the rule that an act where a mischief is sought to be remedied, or an evil to be cured, in order to advance the remedy and suppress the mischief, the reason, purpose, and object of its enactment should be resorted to. That tribunal, however, in construction of penal statutes, has also said:

"But this court has repeatedly held that this rule does not apply to instances which are not embraced in the language employed in the statute, or implied from a fair interpretation of its context, even though they may involve the same mischief which the statute was designed to suppress." United States v. Chase, 135 U. S. 255, 10 Sup. Ct. 756, 34 L. Ed. 117 (a criminal statute under construction).

That court again argued, in the case of U. S. v. Harris, 177 U. S. 305, 20 Sup. Ct. 609, 44 L. Ed. 780, that a penalizing statute would not be given an artificial construction based upon a consideration of the mischief sought to be remedied. The act of Congress of March 3, 1873 (17 Stat. 584, c. 252), for the prevention of cruelty to animals while in transit by railroad or other means of transportation, in imposing a punishment for its violation upon "any company," was held not to use the word "company" to include a "receiver" of a railroad. The penalty created by the act and recovered in civil actions in the name of the United States was held not to apply to receivers, because, "in order to hold the receivers, they must be regarded as included in the word 'company.' " We have familiar cases in our state where the receiver of a railroad company was attempted to be sued in a death case. The Supreme Court of this state invariably, where the question was raised in any manner, refused to consider the action because it was a case of omission not comprehended within the language of the act, though strong reasons might be advanced that the purpose and object of the law giving a remedy against those denominated in the statute were equally applicable to receivers of railway companies as well as the charterers, owners, or lessees of such railway companies. Turner v. Cross, 83 Tex. 218, 18 S. W. 578, 15 L. R. A. 262. Also see the case of Lipscomb v. Railway Co., 95 Tex. 5, 64 S. W. 923, 55 L. R. A. 869, 93 Am. St. Rep. 804. We are inclined to think that we would be making the law instead of interpreting it if we read into the act a shipment, where the origin and destination were in the same state, when the act reads "transportation from a point in one state to a point in another state"; and we take it that the construction would be uniform whether the actions were penal or civil.

[9] In view of another trial, if the written contract were made as the contract of the shipper, the stipulations limiting liability would control as the damages upon the line of each. Again, if the railway company properly proves the existence of the $96 rate, and the shipper refuses to pay such rate, the liability of the carrier in holding the goods would be that of warehouseman, and not as common carrier.

For the errors indicated, the cause is reversed and remanded for a new trial.

### On Motion for Rehearing.

The insistence of the appellee that this court was in error in applying the freight rate applicable to the controversy, as shown in our original opinion, actuates the following extension of reasons upon that subject: He says in the argument upon his motion:

"The evidence conclusively shows that the appellant the Wichita Falls & Wellington Railway Company of Texas, and its connecting carriers, had failed to file, print, and keep open to public inspection a separately established local rate applying between Wichita Falls and Wellington, and intermediate stations on said line, and in default of such established local rates direct between Wichita Falls and Wellington, Tex., appellants seek to subject this shipment to 23 cents per hundredweight, established for a haul of 317 miles, by way of Amarillo to Shamrock, and an additional two cents per hundredweight for being in Rock Island differential territory 72 miles (Amarillo to Shamrock), while the shipment proceeded directly from Wichita Falls to Wellington, a distance of about 130 miles, claiming, as authority for thus attempting to construct a local rate between Wichita Falls and

Wellington, Supplement No. 24 to Texas Lines Basing Tariff No. 2, Interstate Commerce Commission, effective December 25, 1911, which made the rates between Wellington and all other points * * * the same as between Shamrock, Tex., * * * and many other Texas points being named in said tariff."

If the evidence conclusively shows that, as to the appellants particularly, they had "failed to file * * * separately established local rates applying between Wichita Falls and Wellington," then it necessarily follows as to an interstate shipment a properly filed and published rate issued by the Interstate Commerce Commission would be the only one applicable. The law (Act June 29, 1906, c. 3591, § 2, 34 Stat. 586 [U. S. Comp. St. 1913, § 8569]) now provides:

"That every common carrier * * * shall file with the Commission * * * schedules showing all the rates, fares, and charges for transportation between different points on its own route," etc.

And further provides:

"Nor shall any carrier charge or demand or collect or receive a greater or less or different compensation for such transportation of * * * property * * * between the points named in such tariffs than the rates, fares, and charges which are specified in the tariff filed and in effect at the time. * * *"

In the case of Texas & Pacific Railway Co. v. American Tie & Timber Co., 234 U. S. 146, 34 Sup. Ct. 887, 58 L. Ed. 1255, involving a refusal of the railway company to receive and transport ties on the ground that it had no established filed rates for that purpose, the Supreme Court of the United States said:

"There is no room for controversy that the law required a tariff, and therefore, if there was no tariff on cross-ties, the making and filing of such tariff conformably to the statute was essential."

[10] Hence, as the law now exists, the filed and published rate as to an interstate shipment, whatever the combination may be, is conclusive. See Texas & Pacific Railway Co. v. Mugg, 202 U. S. 242, 26 Sup. Ct. 628, 50 L. Ed. 1011.

[11] This would seem fundamental, and we really conceive that appellee's insistence is that, because the Wichita Valley Railway Company is excepted from the through tariff indicated, the tariff from Wichita Falls to Wellington as indicated in said supplement, could not be used to show a through rate from Spur to Wellington. Appellee says:

"Appellants claim that this exception prevented the through rate established by the tariff referred to applying between Spur and Wellington, and then seek to use the same tariff to establish a local rate of 25 cents for the haul between Wichita Falls and Wellington, rejecting the tariff rate for one purpose because of the Wichita Valley connection with this shipment, and seeking to use the tariff for another purpose in handling the same shipment. * * *"

We attempted to thoroughly consider this reasoning on the original consideration of the case, though not answering it specifically in the opinion.

While the Wichita Valley would not concur in this rate and was excepted from the scope of its operation by the Interstate Commerce Commission, and in consequence the basis between Shamrock, Tex., on the Chicago, Rock Island & Gulf Railway Company, to Texas points, as shown in the tariff, was not applicable to said Wichita Valley as a through rate for the shipment of goods, either from or to points on its line, however, the rate from Wichita Falls to Wellington is an established rate by this same supplement No. 2, promulgating this basis, which rate would have to be used by the road making up the combination for a through rate. It is not excepted from the rate between Wichita Falls and Wellington in making the combination for the through rate.

In our main opinion, though we considered all the assignments in appellant's brief, we desire to note the second assignment of error and the following proposition thereunder:

"In a suit against carriers for damages, where the carriers pleaded that the shipment had moved under a written contract duly executed by the appellee's agent, and the testimony of appellee's agent was to the effect that he signed the contract when it was presented to him, it was error for the court to permit the witness, over the objection of the appellants, to testify that he did not know what was written in the contract, although he signed it, and that he thought he had to sign it in order for the shipment to move forward, and that he did not know the written contract was different from an alleged verbal contract which it was claimed his father had made with the agent prior to the execution of the written contract, for the reason that said testimony had the effect of changing the terms of the written contract, was irrelevant, immaterial, and prejudicial."

Most of the testimony, on page 20 of appellants' brief, of the agent who signed the contract of shipment is so clearly admissible as against the objections made, though one of the statements may be questioned; the latter, however, is not separated so this court could consider it. The preliminary questions and answers of this witness, shown on pages 18 and 19 of the brief, in connection with his father's testimony, and of his own in other portions of the record, are relevant upon the question of the agent's authority to make a contract different from that which the father (the principal) claims was made and consummated between the latter and the agent prior to the shipment. We infer, though not wholly clear, that the son, the agent, testified that he signed the contract of shipment after the goods had been loaded upon the car. In the case of Railway Co. v. Barnett, 27 Tex. Civ. App. 501, 66 S. W. 476, the agent who signed the contract said, "I was authorized and directed by plaintiff to sign said contract;" and the appellate court said there was no evidence when the contract was signed with reference to loading, and also found that plaintiff "contemplated and expected written contracts to be entered into before the cattle left," which elements are not in the record.

We can see no error in the court excluding the witness Fontaine from the courtroom after the rule had been invoked; and as to appellee's insistence that we committed error in our construction of the Carmack amendment, as not being applicable to this character of shipment, we also have attempted to carefully investigate all federal acts material upon this matter, and we see no reason to change our original opinion on that subject.

The motion for rehearing is in all things overruled.