**Florence Blaize EPHRAIM, Plaintiff,**

**v.**

**SAFEWAY TRAILS, INC., Defendant.**

United States District Court
S. D. New York.

May 22, 1964.

Lubell, Lubell & Jones, New York City, for plaintiff; Charles T. McKinney, New York City, of counsel.

Henry S. Miller, New York City, for defendant.

CASHIN, District Judge.

In this action plaintiff seeks to recover damages for personal injuries she sustained in the State of Georgia, while she was traveling by bus on a trip from New York City to Montgomery, Alabama.

Plaintiff, Florence Blaize Ephraim, a Negro lady, is a naturalized citizen of the United States, and a citizen and resident of the State of New York. In August 1959, the time of the incident herein, she was 38 years of age and was employed in New York as a registered nurse.

Defendant, Safeway Trails, Inc., is a corporation organized under the laws of Maryland. Its principal place of business is in Washington, D. C., and it is licensed to do business in New York.

On July 31, 1959, plaintiff went to the Port Authority Bus Terminal in Manhattan and inquired about a round trip ticket from New York to Montgomery, Alabama. She paid defendant's ticket agent $55.80 and in return received a long strip of 12 detachable ticket stubs, with each stub being good for travel on the particular line designated thereon by initials. On each stub there is a legend denoting that the origin of the trip is "New York" and the destination "Montgomery, Ala." On each stub there is a legend describing the separate lap of the journey to Montgomery and return to New York, and a notation that it was issued "For Account of (S)." On the back of the stubs "S" is described as "Safeway Trails, Inc." The agent at the defendant's ticket booth assured plaintiff that on interstate buses there are reservations, and that she would get a seat.

On August 6, 1959, at 12:30 A.M., plaintiff boarded a motor bus owned and operated by defendant and departed on her trip to Montgomery. During the trip southward there were several changes of drivers. Defendant's drivers did not operate south of Washington. When the bus reached that city, defendant's driver left the bus and it was taken over by another driver. Plaintiff had a reservation as far as Raleigh, North Carolina. When plaintiff arrived in Raleigh there was a change of buses and drivers.

During the continuing course of the trip southward through Georgia, the bus had occasion to stop, and a white woman and two small children boarded. When the white woman saw that there were no seats available in the front of the bus (although there were empty seats in the rear), she complained to the driver. The bus driver asked two young men in the front of the bus to permit the woman to be seated. When they refused, the driver approached plaintiff and a Mrs. Rose Benjamin, another Negro woman with whom plaintiff had become friendly during the course of the trip and who was seated next to her. The driver told them "You ought to go to the back of the bus," but they refused. He then told the white woman not to worry and that he would "make a phone call." He left the bus and returned about five minutes later.

The bus continued on its way and stopped some time later at the town of Warrenton, Georgia. In the meantime plaintiff had fallen asleep, but Mrs. Benjamin was awake and her testimony as to what transpired was fully credible. When the bus stopped at Warrenton, the driver got off and returned shortly thereafter, followed by a man who was carrying a club and a pistol and who appeared to be a policeman. The bus driver said to the man "Those two colored girls." The policeman then approached plaintiff and Mrs. Benjamin and said "Get to the back." Mrs. Benjamin did so. He then rudely awakened plaintiff, and when she refused to go to the back of the bus he pulled on her sweater and told her to leave the bus. As she started down the aisle to do so, the policeman shoved her and clubbed her on the head. As she was pushed off the bus, she screamed "Lord have mercy, please don't let him kill me." When this happened, Mrs. Benjamin and a white woman attempted to go to plain-

tiff's aid, but when the bus driver saw them going toward the door to leave, he closed the door and pulled off.

Plaintiff was rendered unconscious from the beating she sustained, and sometime later she awoke to find herself sprawled over a bench, with her head toward the ground. She was in the presence of two white men, and felt some blows to her legs. Her clothes were saturated with blood and she was in considerable pain. The two men threatened to kill her and subjected her to much verbal abuse concerning her race. They put her in the back seat of an automobile and drove off. She was bleeding profusely, however, so they finally took her to the McDuffie County Hospital, where they told a nurse "Just put two stitches in her and let her go." The nurse told them, however, that in view of plaintiff's condition she would have to be admitted to the hospital and would have to remain there. Plaintiff was given emergency care and treatment for her injuries.

The next day she was told by someone at the hospital that she was wanted by the authorities at Warrenton. When plaintiff learned this, she paid the hospital bill and was permitted to leave by the hospital personnel. She returned immediately to New York City by airplane.

On a trip from New York to Montgomery, Alabama, a patron would travel on the line of defendant Safeway Trails, Inc. from New York to Washington, D. C.; from Washington, D. C. to Richmond, Virginia, on the line of Virginia Stage Lines, Inc.; from Richmond, Virginia, to Fayetteville, North Carolina, on the line of the Carolina Coach Company; from Fayetteville, North Carolina, to Augusta, Georgia, on the line of the Queens City Coach Company; from Augusta to Columbus, Georgia, on the line of Southern Stages, Inc.; and from Columbus, Georgia, to Montgomery, Alabama, on the line of Capitol Motor Lines, Inc. The line passing through Warrenton, Georgia, where this incident occurred, is that of Southern Stages, Inc.

Defendant received a commission of 10% of the total cost of the ticket attributable to the transportation of plaintiff over the lines of the connecting carriers operating south of Washington, D. C.

Plaintiff has sued only one defendant, Safeway Trails, Inc. It is the latter's contention that it merely acted as agent for the sale of tickets for the connecting carriers, and consequently it is the wrong defendant. On the back of each of the tickets, comprising the round trip ticket issued by defendant to plaintiff, the following words were printed:—

"In selling this ticket and checking baggage thereon the selling carrier acts only as agent and is not responsible beyond its own line and does not assume expense of transfer at any junction or guarantee any connections."

On the front of the tickets was printed: "Subject to Tariff Regulations." Defendant also asserts that the disclaimer of responsibility included in the filed tariff immunizes it from liability herein. Rule 6(4) of Section A3 of the Rules and Regulations filed by defendant with the Interstate Commerce Commission provides as follows:—

"In issuing tickets and checking baggage under tariffs subject hereto for passage over the lines of other carriers participating in such tariff, the issuing carriers shown in such tariff act only as agents and do not assume responsibility for transportation over the lines of other carriers except as responsibility may be imposed by law with respect to baggage."

A carrier may provide that it will not be responsible for transportation beyond its own line. Indeed, the general rule is that a carrier is only responsible for acts over its own line, acts over which it has control. Louisville & N. R. Co. v. Chatters, 279 U.S. 320, 49 S.Ct. 329, 73 L.Ed. 711 (1929); Spears v. Transcontinental Bus System, 226 F.2d 94, 97 (9 Cir. 1955); Solomon v. Pennsylvania

R. Co., 96 F.Supp. 709 (S.D.N.Y.). Further, cases have held that the limitation of liability on the ticket by the selling carrier as to its own line becomes the lawful condition upon which the service is rendered, binding on the carrier and the patron. Louisville & N. R. Co. v. Chatters, 279 U.S. at 331, 49 S.Ct. 329; Glaser v. Pennsylvania R. Co., 82 N.J. Super. 16, 196 A.2d 539 (1963).

Under the circumstances of the present case, however, it is the opinion of this court that although the exculpatory declarations on the back of the tickets, as well as Rule 6(4) of the tariff, would apply where there is a mere sale of the ticket, there are other factors present here, in addition to a mere sale of a ticket, which render this defendant liable. A contrary result was reached in Glaser v. Pennsylvania R. Co., supra, but it was explicitly found by the court there that the record was destitute of proof that any compensation had been received for selling the through or coupon ticket for use beyond the selling carrier's line. 196 A.2d at 542.

■ In the present case, the defendant received 10% of the proceeds derived from the transportation of plaintiff over the lines of the connecting carriers. In addition, there was an explicit statement on each stub that it was issued for the account of this defendant. Further, when the round-trip ticket was sold to plaintiff, there were representations made to plaintiff that this defendant had undertaken the responsibility of transporting plaintiff to her destination. Thus, the totality of these additional factors result in the defendant in this case becoming the principal in the engagement to transport plaintiff to Montgomery, Alabama, and render the disclaimers inoperative to exempt defendant from liability.

Defendant contends, moreover, that the assault upon plaintiff was not committed by a driver or employee of Southern Stages Inc., but by a known police officer or sheriff. Further, it is contended that the acts of the officer were committed without the permission or authorization of any of defendant's agents, and that the driver or agent of a bus company is powerless to interfere with a known police officer.

The applicable law was set forth at some length in Matthews v. Southern Ry. System, 81 U.S.App.D.C. 263, 157 F.2d 609, 610–611 (1946):—

"This case is governed by the rules of law applicable to the obligations of a common carrier to its passengers and its liabilities for breach of those obligations. A common carrier is required to protect its passengers against assault or interference with the peaceful completion of their journey. But an exception to the general rule is that an agent of the carrier is not required to interfere with a known officer of the law apparently engaged in the performance of his duty. This exception covers the action of an agent of a carrier in pointing out to a known officer of the law persons as to whom the officer inquires. * * * Under the exception, the railroad is not liable for action of its agents in notifying police officers of violations of law or suspected violations. This latter is so because of the basic public policy which protects such notification generally and also because of the primary duty of the conductor of a train to protect passengers from injury by others; e. g., assault, robbery, insult, disturbance, etc., in which cases the conductor must call the police. But the exception goes no further. It does not cover the action of the agent in otherwise causing, procuring, assisting in, or participating in the arrest or ejection, or where the arrest is at the instance of the agent. In other words, there is a clear line between the action of an agent of a carrier in merely notifying the police of a violation of law or identifying persons at the request of a police officer, and his action in going beyond mere notification or identification and by some additional

act procuring, causing, directing, or participating in an arrest or ejection."

In the instant case, the evidence is abundantly clear that the entire occurrence was instigated by the bus driver. Plaintiff was not causing a disturbance, and had not violated any regulation or law. Notwithstanding this fact, the driver left the bus and made a telephone call to the police and deliberately brought about the unlawful ejection of plaintiff from the bus. He himself directed the officer to plaintiff without any prior request, and further prevented anyone from coming to plaintiff's assistance. This is a clear case in which the driver maliciously initiated, instigated and brought about the unlawful ejection of plaintiff and thereby proximately caused the damages and injuries sustained by her. Under these circumstances, it is no defense that the physical assault itself was not committed by the driver.

I come now to a determination of the amount of plaintiff's damages. At the time of this occurrence, plaintiff was employed as a nurse on a per diem basis, with daily earnings of approximately $12.50. As a result of the injuries sustained herein, she was absent from work for 20 days for a total loss of earnings of approximately $250. In addition, plaintiff paid $39 for the hospital bill at the McDuffie County Hospital, and $23 to a doctor there. In New York she paid $40 for x-rays and a total of $45 to her physician.

Plaintiff was struck on the head and sustained a laceration of the forehead. I accept the testimony of Dr. Edith Alexander, plaintiff's physician, that plaintiff suffered a cerebral concussion as a result of this incident. The injury to her forehead has resulted in a small permanent scar which remains sensitive to the touch. She still suffers occasional spells of dizziness attributable to the blow to her head. She sustained a hematoma of her right shin, and various other cuts and bruises. She also has a slight permanent scar over the anterior

tibial surface of the right leg. Further, plaintiff suffered emotional distress and humiliation as a result of this incident. I find that plaintiff is entitled to recover damages in the sum of $5,000.

The above shall constitute my Findings of Fact and Conclusions of Law.

Submit judgment.